UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

SECURITIES AND EXCHANGE COMMISSION,

          Plaintiff,

v.

LAWRENCE B. EVANS, DAVID L. McQUILLIN,
and LISA W. ZAPPALA,

          Defendants.
_____

    )
    )  **JURY TRIAL DEMANDED**
    )
    )
    )  Case No. _____
    )
    )
    )
    )
    )
    )

## COMPLAINT

1.     Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), for its Complaint against defendants Lawrence B. Evans ("Evans"), David L. McQuillin ("McQuillin") and Lisa W. Zappala ("Zappala"), alleges the following:

## SUMMARY

2.     This Commission enforcement action concerns an accounting fraud perpetrated between at least 1999 and 2002 by Evans, McQuillin and Zappala, three former senior executives of Aspen Technology, Inc. ("Aspen"). Aspen is a Cambridge, Massachusetts-based provider of computer software and related services to industries such as petroleum, chemicals and pharmaceuticals. During the relevant period, Aspen improperly recognized software license revenue on at least six different transactions involving at least five different customers world-wide. The defendants were specifically and directly involved in improperly recognizing revenue on these transactions. The transactions all involved the premature and improper recognition of revenue because the relevant contracts were not signed within the appropriate quarter and/or

fiscal year or because the earnings process had not been completed within the appropriate quarter and/or fiscal year due to side letters or other contingency arrangements which changed the terms of the customers' payment commitments under the signed contracts.

3. On October 27, 2004, Aspen publicly announced that its audit committee had "undertaken a detailed review of the accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during fiscal years 2000-2002."

4. On November 24, 2004, Aspen publicly announced that, at its Board of Directors' request, McQuillin had resigned from the Board and as the company's Chief Executive Officer ("CEO"). At the same time, Aspen announced that its audit committee had concluded that, as a result of its previously-announced review of certain software license agreements, "reported revenue for the fiscal years 2000 and 2001 was overstated and that reported revenue for the fiscal years 2002, 2003 and 2004 was understated." Aspen therefore noted that its review "will lead to a restatement of its financial statements ... for the fiscal years ended June 30, 2000 through June 30, 2004" and that "previously issued financial statements and any related auditor's reports for those periods should not be relied upon."

5. On March 15, 2005, following completion of the investigation by its audit committee, Aspen restated its financial statements for fiscal years ended June 30, 2000 through June 30, 2004. Among other things, the restatement revealed that net income in fiscal years 2001 and 2000 decreased by $16.4 million and $8.7 million, respectively. The restatement also resulted in increases in net income of $6.9 million in fiscal year 2004, $21.6 million in fiscal year 2003 and $1.2 million in fiscal year 2002. The restatement also revealed that total revenues for

2

fiscal 2004 increased by $7.3 million; total revenues for fiscal year 2003 increased by $23.7 million; total revenues for fiscal year 2002 increased by $1.8 million; total revenues for fiscal year 2001 decreased $12.5 million; and total revenue for fiscal year 2000 decreased $7 million.

6.      Through their conduct, Evans, McQuillin and Zappala violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Exchange Act Rules 10b-5, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2] thereunder. Through their conduct, each defendant aided and abetted Aspen's violations of Exchange Act Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

7.      For the reasons discussed herein, the Commission seeks all of the relief sought herein.

## JURISDICTION

8.      The Commission is an agency of the United States of America established by Section 4(a) of the Exchange Act [15 U.S.C. §78d(a)].

9.      This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e) and 78aa]. Venue is proper in the District of Massachusetts because Aspen is a Cambridge, Massachusetts-based company and defendants all reside within the district and committed many of the acts and/or omissions discussed herein within the district.

3

10.     In connection with the conduct described in this Complaint, the defendants directly or indirectly made use of the mails or the means or instruments of transportation and communication in interstate commerce.

## DEFENDANTS

11.     **Evans**, age 70, is a resident of Cambridge, Massachusetts.  Evans is Aspen's founder and was, during the relevant period, Aspen's Chairman of the Board ("Chairman") and its CEO.  Evans resigned as CEO in or about October 2002 but continued as the Chairman until in or about January 2005.  Evans also served as Aspen's President from at least January 2001 through September 2002.  Evans continues to serve as a senior adviser to Aspen.  Evans asserted his Fifth Amendment privilege against self-incrimination during investigative testimony before the Commission staff in response to all substantive questions concerning the transactions discussed in this Complaint.

12.     **McQuillin**, age 48, is a resident of Sudbury, Massachusetts.  McQuillin joined Aspen in 1997 as its head of worldwide sales and marketing and was promoted to co-Chief Operating Officer ("COO") in January 2001.  McQuillin also served as Aspen's President, CEO and as a member of its Board of Directors between at least October 2002 and November 2004. McQuillin asserted his Fifth Amendment privilege against self-incrimination during investigative testimony before the Commission staff in response to all substantive questions concerning the transactions discussed in this Complaint.

13.     **Zappala**, age 45, is a resident of Needham, Massachusetts.  Zappala served as Aspen's Senior Vice President and Chief Financial Officer ("CFO") between at least September 1998 until she resigned as CFO in or about July 2003.  After her resignation as CFO, Zappala

4

took on an advisory role at Aspen as its Senior Vice President of Finance. Zappala resigned from Aspen in or about December 2004. Zappala has previously held a Massachusetts license as a Certified Public Accountant ("CPA"); her CPA license expired in or about 1994. Zappala asserted her Fifth Amendment privilege against self-incrimination during investigative testimony before the Commission staff in response to all substantive questions concerning the transactions discussed in this Complaint.

## RELATED ENTITY

14.     **Aspen** is a Delaware corporation with its headquarters in Cambridge, Massachusetts. Aspen sells computer software and related services to industries such as petroleum, chemicals and pharmaceuticals. Aspen's common stock was, during all relevant times, registered with the Commission pursuant to Section 12(g) of the Exchange Act. Aspen's fiscal year ends on June 30.

## STATEMENT OF FACTS

15.     During the relevant period, Aspen's revenue generally came from two sources: (i) sales of software licenses and (ii) sales of services that Aspen provided in installing and implementing the software licenses. During the relevant period, Aspen's revenues were split approximately 50/50 between these two sources, but Aspen's profit margins were much higher on the software license sales. In addition, software license revenues generally drove Aspen's revenue stream because Aspen's service revenue was generally tied to Aspen's software license sales.

16.     During the relevant period, Aspen's publicly stated revenue recognition policy was consistent with criteria laid out in Statement of Position No. 97-2, Software Revenue

5

Recognition ("SOP 97-2"). SOP 97-2 was issued in 1997 by the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants (AICPA).

17. Among other things, SOP 97-2 generally states that software license revenue may only be recognized if certain conditions are met. Among the conditions are that: (1) there is persuasive evidence of an arrangement between the buyer and seller; (2) delivery of the software by the seller to the buyer has occurred; (3) the fee that is to be paid by the buyer to the seller for the software is either fixed or determinable; and (4) collectibility of the fee by the seller from the buyer is probable. (SOP 97-2, ¶ .08).

18. During the relevant period, Aspen customarily used written contracts to memorialize agreements which resulted in software license revenue. As such, it was required by SOP 97-2, and its publicly stated revenue recognition policy, to have signed written contracts in place before it could recognize any license revenue. (SOP 97-2, ¶ .16) (if a company has a "customary business practice of utilizing written contracts, evidence of the arrangement is provided only by a contract signed by both parties").

19. During the relevant period, SEC Staff Accounting Bulletin No. 101 ("SAB 101"), entitled "Revenue Recognition in Financial Statements," stated that a customer's execution of a sales agreement after the end of a quarter causes the transaction to be considered a transaction in the subsequent period. In its Form 10-K for the fiscal year ended June 30, 2001 (which was filed on or about September 28, 2001), Aspen stated that it had adopted SAB 101 in that fiscal year.

20. During the relevant period, Aspen improperly recognized software license revenue on at least six different transactions involving at least five different customers world-wide. As further detailed below, the defendants were specifically and directly involved in improperly

6

recognizing revenue on these transactions.

## Lyondell-Equistar

21. Aspen, acting through the individual defendants, improperly recognized a total of $9.9 million of software license revenue in its fiscal quarters ended June 30, 1999 and September 30, 1999 on a sale to a group of Houston, Texas-based related entities (Equistar Chemicals, LP, Lyondell Chemical Company, Lyondell Chemical Worldwide and Lyondell Methanol Company LP (collectively, "Lyondell-Equistar")). The revenue should not have been recognized because there was a side agreement to the contract whereby Aspen also promised to deliver an undetermined amount of software in the future at no additional cost.

22. Beginning at least as early as late 1998, Aspen and Lyondell-Equistar commenced negotiations towards reaching a software license agreement.

23. On or about December 13, 1998, J.M., an Aspen salesperson who had been involved in negotiations with Lyondell-Equistar, sent an e-mail to Zappala (on which he copied W.T., an in-house attorney at Aspen). The December 13, 1998 e-mail's subject line was "Special Letter." In the December 13, 1998 e-mail, J.M. wrote, in part: "I need to put together a letter from Larry [Evans] that says that as long as the customer stays on support that they will continue to get all of the AspenTech [software] products ... . As we develop or buy new products it would go [to the customer]. ... [I]n lieu of putting this in the contract it will be a side letter. ... Basically, this letter would give them the 'all we ever will be commitment' in an acceptable communication from AspenTech." A document entitled "Side Letter.doc" was attached to the December 13, 1998 e-mail.

24. On or about February 12, 1999, Evans sent an e-mail to Zappala and others. The

7

February 12, 1999 e-mail's subject line was "The Equistar Project is at a Highly Critical Stage –
we Need Everybody's Support." In the February 12, 1999 e-mail, Evans wrote, in part: "[I]t is
absolutely critical that we get our [software] implementation installed and running at [a
Lyondell-Equistar site] by April 1. ... Failure is not an option here. We have to be successful. In
many ways we have bet the company on the success of this pilot at [the Lyondell-Equistar site]
and we have made important commitments to Equistar. Our honor is at stake. You can imagine
the field day our competitors would have if this doesn't work."

25.     On or about June 27, 1999, S.D., Aspen's then-Senior Vice President and General
Counsel, copied Zappala and others on an e-mail which he sent to W.T., the in-house attorney at
Aspen and to S.W., a Lyondell-Equistar employee. Referring to a draft of a proposed software
support agreement between Aspen and Lyondell-Equistar, S.D. noted that, with respect to
"Section 2(e) [thereof,] I'll leave the revenue recognition issue here to Lisa [Zappala] ... ."

26.     On or about June 29, 1999, W.T., the in-house attorney at Aspen, copied Zappala
and others on an e-mail he sent to at least several employees at Lyondell-Equistar. One of the
attachments to the June 29, 1999 e-mail was a draft, red-lined version, of the "Special Option
Product Support Agreement" ("Support Agreement") between Aspen and Lyondell-Equistar.

27.     Section 2(e) of the draft, red-lined version, of the Support Agreement attached to
the June 29, 1999 e-mail on which W.T., the in-house Aspen attorney, copied Zappala stated:
"RELEASES. Provided that Customer timely pays the applicable fees and Customer remains in
compliance with its obligations hereunder and under the terms of the License Agreement,
Customer will receive all Modules and Releases free of charge." The following portion of text
was deleted from Section 2(e) of the draft, red-lined, version of the Support Agreement attached

8

to the June 29, 1999 e-mail: "This benefit does not include Modules of the Software which are part of a new Release. If Customer wishes to receive a Module, it must be purchased separately."

28.     Also attached to the June 29, 1999 e-mail on which W.T., the in-house Aspen attorney, copied Zappala was a draft, red-lined version of a letter, dated June 30, 1999, from Evans to B.T., a Lyondell-Equistar official. The June 30, 1999 draft, red-lined, letter stated, in part: "During our acquisitions of products over the past several years we have added many new products to our product family, which includes all of our products ... . When we have acquired or developed products within the same product family, we have included the products or merged them to provide the combined technology as an upgrade for any existing alliance partners on maintenance. Please accept this letter as my commitment to you that, if we acquire or develop products in the product families which we license to our customers in our normal course of business, we will provide the new technology in addition to our existing technology."

29.     In or about June 1999, a draft of the Support Agreement was reviewed by Arthur Andersen ("AA"), Aspen's outside auditing firm. AA expressed concern that the term "module," as used in the draft Support Agreement, was vague and could be interpreted to require Aspen to deliver additional future software products to Lyondell-Equistar at no additional cost.

30.     When unspecified additional products are part of a software license arrangement, SOP 97-2, ¶.49 requires that the software revenue be recognized ratably over the term of the arrangement.

31.     In or about late June or early July 1999, S.D., Aspen's then-Senior Vice President and General Counsel copied Zappala on an e-mail he sent to S.W., a Lyondell-Equistar employee. In the late June/early July 1999 e-mail, S.D. noted that: "As I believe you know,

9

Arthur Andersen objected to the definition of 'Module' in the [draft Support Agreement] on the basis that it appeared to promise future products as opposed to future functionality. I also realize that is what you want, and I think I have a way to still get there. ... The definition of 'Module' will need to relate to current products, but we can provide the needed language in a joint marketing and development agreement."

32.     In or about early July 1999, as he had suggested in the late June/early July 1999 e-mail to S.W. (on which he had copied Zappala) should be done, S.D., Aspen's then-Senior Vice President and General Counsel modified the term "module" in the draft Support Agreement to address the concern which had been raised by AA, Aspen's outside auditor. The final version of the Support Agreement defined "module" in a manner that had been approved by AA, Aspen's outside auditor, thus purportedly allowing Aspen to recognize the revenue all at once and up-front.

33.     In or about early July 1999, S.D., Aspen's then-Senior Vice President and General Counsel, as he had suggested in the late June/early July 1999 e-mail to S.W. (on which he had copied Zappala) should be done, drafted another document (entitled a Joint Development Agreement ("JDA")) and therein incorporated, in substance, the provisions (which had been found objectionable by AA, Aspen's outside auditors) regarding delivery of anticipated future Aspen software. The JDA was effectively a side agreement, intended to allow Aspen to recognize revenue that it would not have been allowed to recognize if the terms of the JDA were incorporated into the Support Agreement.

34.     The final version of the JDA, dated August 20, 1999 and signed by Zappala on Aspen's behalf, contemplated that, under certain conditions, Lyondell-Equistar "shall receive a

10

99-year, worldwide, royalty-free license to any and all software products (including upgrades, releases, modules, and documentation), technologies, or functionality relating to [Aspen's] existing or new products ("Deliverables")."

35.     In addition to granting Lyondell-Equistar "royalty-free licenses" under certain conditions, the JDA makes clear that "[n]o minimum level of participation is required for [Lyondell-Equistar] to preserve its rights to receive ... Deliverables" developed pursuant to it.

36.     The JDA also makes clear that Lyondell-Equistar is entitled to receive new "Deliverables" pursuant to it so long as Lyondell-Equistar "continues to purchase ... services from AspenTech under the ... Support Agreement dated June 30, 1999 ... ."

37.     On or about June 30, 1999, Aspen entered into a purported $9.9 million "Special Option Software License Agreement (Revised)" ("SLA") with Lyondell-Equistar. Pursuant to the SLA, Aspen agreed to grant Lyondell-Equistar a 99-year software license to certain software products listed in an exhibit to the SLA.

38.     Pursuant to the SLA, Lyondell-Equistar's "[d]ue [d]ate" on its $9.9 million payment to Aspen was July 1, 1999. In addition, if Lyondell-Equistar failed to make its required payment pursuant to the SLA within forty five (45) days following the due date, then "all amounts owed by [Lyondell-Equistar] ... shall become immediately due and payable ... ." Lyondell-Equistar did not make the $9.9 million payment due pursuant to the SLA until on or about August 23, 1999.

39.     Pursuant to the SLA, Aspen's software products were to be shipped to Lyondell-Equistar in two tranches: the first on June 30, 1999 and the second on July 15, 1999.

40.     On or about June 30, 1999, Aspen also entered into a Support Agreement with

11

Lyondell-Equistar. Pursuant to the Support Agreement, Aspen was to provide "support services" for software purchased by Lyondell-Equistar pursuant to the SLA.

41.     On or about June 30, 1999 (or the last day of the quarter), Zappala signed the SLA and the related Support Agreement, which no longer contained the language regarding delivery of anticipated future Aspen software which Aspen had, in substance, moved into the JDA.

42.     On or about June 30, 1999, Evans sent a letter to B.T., the Lyondell-Equistar official. Among other things, Evans noted in the June 30, 1999 letter that "AspenTech is committed to continuing to enhance our product offerings to remain competitive. During the past several years we have enhanced our suite of enterprise optimization solutions through internal development and acquisitions. Our current enterprise optimization solutions are outlined in [the SLA.] Those enhancements to our offerings will be available to you as upgrades provided under the provisions of the [Support Agreement]."

43.     On or about July 2, 1999, Evans forwarded to Zappala an e-mail which he had that day sent to Aspen's Board of Directors and Aspen's General Counsel. Among other things, Evans' July 2, 1999 e-mail stated: "I wanted to let you know that we made the quarter. ... We only need about $2-3 million of the Lyondell-Equistar deal to make this quarter's numbers, so we will have a nice 'freezer' going into Q1."

44.     On or about November 28, 2003, O.B., an Aspen Vice-President for Regional Sales sent an e-mail to S.C., Aspen's Vice President of Field Sales. In the November 28, 2003 e-mail, O.B. stated, among other things: "I call this a side deal! We closed Lyondell-Equistar in 1999 giving them unlimited access to all our technology available at the signature date. It seems like we also sent a letter offering unlimited access to all FUTURE products!"

12

45. Aspen accounted for the $9.9 million in license revenue referenced in the SLA up front over two quarters: approximately $4.5 million (the purported value of the software shipped) in the quarter ended June 30, 1999 (Aspen's fiscal fourth quarter) and approximately $5.4 million (the purported value of the software shipped) in the quarter ended September 30, 1999 (Aspen's fiscal first quarter).

46. The approximately $4.5 million from the Lyondell-Equistar transaction that Aspen recorded on its books and records in the quarter ended June 30, 1999 (Aspen's fiscal fourth quarter) was included in revenue reported in Aspen's Form 10-K for the fiscal year ended June 30, 1999, which was signed by Evans and Zappala and filed with the Commission on or about September 28, 1999.

47. The approximately $5.4 million from the Lyondell-Equistar transaction that Aspen recorded on its books and records in the quarter ended September 30, 1999 (Aspen's fiscal first quarter) was included in revenue reported in Aspen's Form 10-Q for the quarter ended September 30, 1999, which was signed by Zappala and filed with the Commission on or about November 15, 1999.

48. The $9.9 million in license revenue from the Lyondell-Equistar transaction should not have been recorded upon delivery because the arrangement provided for future delivery of unspecified product. Instead the revenue should have been recorded ratably over the term of the arrangement, beginning in the fiscal quarter when shipment was completed (i.e., the quarter ended September 30, 1999). Shipment of the Aspen software that was the subject of the SLA was not completed until on or about August 16, 1999.

49. On or about August 5, 1999, Aspen issued a press release that falsely and

13

inaccurately summarized its financial results for the fiscal fourth quarter and fiscal year ended June 30, 1999. The press release stated that "Aspentech's most significant fourth quarter transaction was an agreement with [Lyondell-Equistar] ... ." The press release also quoted Evans as stating that: "AspenTech achieved a number of important operational goals in the fourth quarter, along with improved execution and financial results in line with our expectations ... ." The press release also quoted Zappala as stating that: "[O]ur balance sheet remains strong and will be an important asset as we leverage the benefits from implementing our new organizational structure and strategy." Zappala was also listed as one of two contact persons on the August 5, 1999 press release.

50.    On or about October 26, 1999, Aspen issued a press release that falsely and inaccurately summarized its financial results for the fiscal first quarter ended September 30, 1999. Both Evans and Zappala were quoted in the October 26, 1999 press release. Zappala was also listed as one of two contact persons on the October 26, 1999 press release.

51.    Evans and Zappala knew, or were reckless in not knowing, that the recognition of license revenue from the Lyondell-Equistar transaction in the fiscal quarters and fiscal year in which it was recognized was improper.

52.    The misstatements caused by the improper revenue recognition were material. The approximately $4.5 million from the Lyondell-Equistar transaction recorded by Aspen in the quarter ended June 30, 1999 constituted approximately 18% of the total license revenue recorded that quarter. The approximately $5.4 million from the Lyondell-Equistar transaction recorded by Aspen in the quarter ended September 30, 1999 constituted approximately 25% of the total license revenue recorded that quarter.

14

53. For the quarter ended June 30, 1999, Aspen reported a loss, excluding one-time charges, of $0.14 per share, which beat the consensus analyst estimate of a loss of $0.16 per share, excluding one-time charges. Had the revenue from the Lyondell-Equistar transaction not been recorded in the quarter ended June 30, 1999, Aspen would have been forced to report a loss of approximately $.32 per share, excluding one-time charges, that quarter.

54. For the fiscal year ended June 30, 1999, Aspen reported a loss, excluding one-time charges, of $0.59 per share, which beat the consensus analyst estimate of a loss of $0.64 per share, excluding one-time charges. Had the revenue from the Lyondell-Equistar transaction not been recorded in the fiscal year ended June 30, 1999, Aspen would have been forced to report a loss of approximately $0.78 per share, excluding one-time charges, that fiscal year.

55. For the fiscal quarter ended September 30, 1999, Aspen reported a loss of $0.11 per share, which beat the consensus analyst estimate of a loss of $0.15 per share. Had the revenue from the Lyondell-Equistar transaction not been recorded in the fiscal quarter ended September 30, 1999, Aspen would have been forced to report a loss of approximately $.31 per share that fiscal quarter.

56. For the quarter ended June 30, 1999 (Aspen's fiscal fourth quarter), Aspen recognized approximately $24.8 million in license revenue. Had the revenue from the Lyondell-Equistar transaction not been recorded in the quarter ended June 30, 1999, Aspen would have only been able to record approximately $20.2 million in license revenue that quarter. Aspen therefore overstated its license revenue for the quarter ended June 30, 1999 by approximately 22%.

57. For the quarter ended September 30, 1999, Aspen recognized approximately $21.4

million in license revenue. Had the revenue from the Lyondell-Equistar transaction not been recognized in the quarter ended September 30, 1999, Aspen would have only been able to recognize approximately $16 million in license revenue that quarter. Aspen therefore overstated its license revenue for the quarter ended September 30, 1999 by approximately 31%.

58.     The revenue from the Lyondell-Equistar transaction should have been recognized ratably over the term of the arrangement, approximately $2 million per year in fiscal 2000 through 2004.

59.     In or about March 2005, Lyondell-Equistar was one of the transactions restated by Aspen following completion of the internal investigation by its audit committee.

60.     The effect of the improper accounting for this Lyondell-Equistar transaction was to overstate net income in the fiscal years ended June 30, 1999 and 2000 by $4.5 million ($0.18 per share) and $3.6 million ($0.12 per share) respectively and to understate net income in the years ended June 30, 2001, 2002, 2003, and 2004 by $2 million each year, or between $0.05 and $0.07 per share.

## Logica UK Ltd.

61.     Aspen, acting through the individual defendants, improperly recognized $1.75 million of software license revenue in its fiscal quarter ended December 31, 2000 on a sale to Logica UK Limited ("Logica"), a British software company. The revenue should not have been recognized because there was a side agreement to the contract which provided that Logica was not obligated to pay Aspen unless Aspen provided Logica with a minimum amount of software implementation services revenue.

62.     Beginning at least as early as April 2000, Aspen and Logica UK Limited

16

("Logica"), a British software company, pursued joint opportunities attempting to supply software products and related services to companies in different industries.

63.    In or about late July or early August 2000, Aspen and Logica entered into a Systems Integrator Agreement ("SI Agreement") which, by its terms, was "effective as of May 1, 2000." Pursuant to the SI Agreement, Aspen would license certain of its software, at a 30% discount, to Logica.  Logica would, in turn, "use the AspenTech Software in the performance of consulting and systems integration services for its clients who are licensees of the AspenTech Software.  Such services shall include project management, software development, and other systems integration projects."  There were no payments associated with the execution of the SI Agreement.

64.    At least as early as Fall 2000, Aspen and Logica began discussions concerning a broader re-seller relationship, in which Logica would resell Aspen software licenses.

65.    On or about December 15, 2000, S.P., an Aspen accounting official who reported directly to Zappala, forwarded an e-mail string to Zappala. The e-mail string's subject heading was "Logica." In one of the e-mails (dated December 12, 2000) which S.P. forwarded to Zappala, R.H., an Aspen salesperson, wrote to S.P.: "Cards on the table time, the [contemplated] Logica deal is not just about Licenses, it is in effect a trade. We will get $2000K in licenses which Logica will sell on into Utility customers in the UK & Germany and in return they get $7.5M in services from us over a three year period. ... They want us to link the payments to licenses with the services business so that they don't have to pay for all the licenses upfront and wait for the services to come in.  The agreements would be a separate license and services agreement ... ."

17

66.     Within the same e-mail string which S.P. forwarded to Zappala on or about
December 15, 2000 was another e-mail (dated December 14, 2000) in which J.M., an Aspen
official raised concerns about the contemplated Logica transaction. J.M. also noted in the
December 14, 2000 e-mail that "[t]he value of [Logica] Consultancy Services suggested here
($7.5 m) is greater than our entire annual ... Services revenue in [the region] currently. There is
absolutely no way we could commit to delivering anything even close to this level of business
(even if we were to position Logica as our Number 1. Partner and looked to direct work to them
in preference to doing it ourselves) and there is no way Logica could credibly deliver it."

67.     J.M. also expressed concern in the December 14, 2000 e-mail (which was
forwarded by S.P. to Zappala) that "[i]f all this ... needs to be in place to close a license deal in
Q2, then now is not the time for the real detail on this process and particularly the services
commitments to emerge. I fail to see what benefit there is to anyone in AspenTech to have so
little visibility on critical information such as this until the very last minute."

68.     On or about December 17, 2000, J.T., an Aspen salesman, sent an e-mail, whose
subject line was "Logica," to McQuillin and several other Aspen employees. J.T. copied Evans,
Zappala and others on the December 17, 2000 e-mail. In the December 17, 2000 e-mail, J.T. also
referred to the contemplated Logica transaction as a "'trade' between License and Services ... ."

69.     On or about December 19, 2000, McQuillin sent an e-mail (on which he copied
Evans, Zappala and others) in response to J.T.'s December 17, 2000 e-mail. In the December 19,
2000 e-mail, McQuillin stated: "we appreciate the creativity of the [regional] Sales and Partner
teams in trying to get Q2 license revenue from Logica. Certainly, Q2 revenue is important to the
company."

18

70.     McQuillin also noted in the December 19, 2000 e-mail (on which he copied Evans, Zappala and others): "However, there are ... reasons why we cannot and will not 'guarantee' services to Logica. ... A guarantee means a financial obligation to AspenTech and that means netting that obligation out of the license agreement - even if the 'guarantee' is made in a separate document like an MOU. This would mean a NEGATIVE revenue event in Q2 ... $7.5m services obligation - $2m license agreement = ($5.5m). ... We know of no other company guaranteeing services for partners - certainly they prime the pump by bringing their partners business, as we should, but not guaranteeing services."

71.     On or about December 19, 2000, J.T. sent another e-mail to McQuillin and others (on which he copied S.P., the Aspen accounting official who reported directly to Zappala). In the December 19, 2000 e-mail, J.T. wrote, in part: "We understand very well that we can't go with Logica on a 'barter' deal, exchanging Services against Licenses. ... The only way to get Logica starting up a serious investment in education to reach the critical mass of consultants is to develop with them a plan they are confident with. They need to have some well identified business on their horizon. ... [We] have identified some of them. We are preparing a letter where David McQuillin will indicate the strong intention of the company to have Logica as our Preferred Partner ... and to make it possible for them to get their people educated ASAP on some identified projects we have in the pipe. ... As David [McQuillin] said, we have to 'prime the pump'."

72.     On or about December 20, 2000, C.D., a mid-level Aspen manager, sent an e-mail (on which he copied McQuillin, Zappala and others) to several Aspen employees. Among other things, C.D. noted in the December 20, 2000 e-mail that: "The intent to provide Logica with

19

$7.5M of services over the next 3 years means that Aspen will on average need to provide Logica with work for 8-10 resources on an annual basis over a 3 year period."

73.     On or about December 31, 2000, Aspen entered into a Software License and Service Agreement ("SLA") with Logica. Pursuant to the SLA, Logica was to license £1,333,332 (or approximately $1.75 million) worth of software from Aspen over three years.

74.     Pursuant to the SLA, Logica was to make six equal payments of £242,525 (or approximately $348,000) for the software products referenced therein. The six payments were to be made on March 31, 2001, September 30, 2001, March 31, 2002, September 30, 2002, March 31, 2003 and September 30, 2003. Logica, in fact, only made the first two payments referenced in the SLA, totaling approximately $696,000.

75.     The SLA was signed on Aspen's behalf by H.B, a managing director, on or about December 31, 2000. A duplicate copy of the SLA was also signed by Zappala on or about December 29, 2000.

76.     On or about December 30, 2000, H.B., the Aspen managing director who signed the SLA, also signed a Memorandum of Understanding ("MOU") on Aspen's behalf with Logica. The MOU was effectively a side agreement, which rendered Logica's payments under the SLA contingent upon Aspen providing Logica with a minimum amount of services revenue.

77.     The MOU specifically referenced the SLA and stated, in part: "AspenTech will use reasonable endeavors to assist Logica to sell [the SLA] licenses to the target market, including the allocation of 25% of the time of an experienced Sales Account Manager. In addition, if it becomes apparent after a period of 12 months that Logica will be unable to sell the 14 licenses, by the end of the 3 year period, AspenTech will review opportunities amongst its

20

other clients to sell these licenses."

78.     The MOU also stated, in part: "AspenTech will provide £5,000,000 [or

approximately $7.5 million] worth of consultancy services over 3 years to be carried out on a

time and materials basis. AspenTech shall use reasonable endeavors to provide a sufficient

amount of services to Logica, such that in any rolling three-month period, the value of the

services is at least £417,000.00 [or approximately $625,000]. ... Logica may terminate the SI

Agreement by written notice, if AspenTech fails to remedy a material obligation of the

Agreement, in accordance with the terms set forth therein. For the avoidance of doubt, the

provision by AspenTech of a rolling three-month service level of £417,000 is a material

obligation of the agreement."

79.     The MOU also stated, in part: "AspenTech confirms that, in the event the SI

Agreement is terminated, that it will not pursue Logica for payment of License and Support Fees

associated with software that has not been sold to a client. ... Furthermore, AspenTech will

refund all monies paid by Logica in respect of License and Support fees, less the value of any

licenses sold up to the date of termination."

80.     On or about January 6, 2001, Evans sent an e-mail to McQuillin to which was

attached a "Sales Action Plan." In the "Sales Action Plan," Evans stated, in part: "Manage the

Q2 Close and Explanation ... Don't take ... Logica – [it's] not revenue, we're still negotiating.

Explain what happened and what it means[.]"

81.     Evans also stated, in part, in the "Sales Action Plan" attached to his January 6,

2001 e-mail to McQuillin: "Need to Understand ... Why we fell short in Q2 ... Why we didn't

anticipate it and take corrective action sooner[.]"

21

82.     Evans also stated, in part, in a document attached to his January 6, 2001 e-mail to McQuillin that he intended to assist Zappala in finalizing "Q2 revenue" and in developing an "explanatiion [sic] for what happened in Q2[.]"

83.     On or about March 22, 2001, C.D., the mid-level Aspen manager, sent an e-mail to several Aspen employees, on which he copied Evans, McQuillin and Zappala. In the March 22, 2001 e-mail, C.D. stated, in part: "We must fulfill our obligation to provide Logica with $2.5M of services on an annual basis over a three year period, totaling $7.5M. This equals 8 Consultants on an annual basis. ... [I]n order to prime the pump, we would make available three (3) service opportunities to Logica in the next four (4) weeks."

84.     C.D. also noted in the March 22, 2001 e-mail: "Per our conversation with Lisa Zappala this morning, in order to help Logica's cash flow, [Aspen will] give them the ability to invoice us in advance for twelve (12) weeks of consulting time ... if it helps Logica get the cash to pay our invoices."

85.     In or about April or May 2001, Aspen and Logica agreed to an amendment to the original SI Agreement ("SI Amendment"), which, by its terms, was effective on January 1, 2001. The SI Amendment specifically referenced the SLA and stated, in part, that, with respect to the software covered thereby, "where a potential new customer is identified for the Software, [Logica] will be given the first opportunity to bid and the last, irrespective of where the source originated from."

86.     The SI Amendment also stated, in part, that "[t]he value of Consultancy Services to be provided to [Logica] over 3 years is £5,000,000 ... and [Logica] will carry out such services on a time and material basis. AspenTech shall use all reasonable endeavors to provide a

22

sufficient amount of Consultancy Services to Logica, such that in any rolling three-month period, the target service level of services is at least £417,000 [or approximately $625,000]."

87.     The SI Amendment also stated, in part, that "[Logica] may terminate the [SI] Agreement forthwith, in the event AspenTech fails to secure, on behalf of [Logica], a license sale with a value not less than £666,667 [or approximately $1 million] on or before 30th June 2001."

88.     The SI Amendment also stated, in part, that "[Logica] may terminate the [SI] Agreement forthwith, in the event AspenTech fails to secure, on behalf of [Logica], a further license sale with a value not less than £166,667 [or approximately $250,000] on or before 30th September 2001."

89.     On or about August 21, 2001, J.T., the Aspen salesman, sent an e-mail to McQuillin and others in which he stated, in part: "The original deal was for Logica to share some of our services in the Petroleum/PetroChemicals sector and in return they would buy $2M of ... software which they would sell on in the Utilities sector. Since we closed the deal in Q2 last fiscal, we have not held up our side of the deal, the result is Logica have become unwilling to pay due license bills until they see some commitment from us to the relationship. At the time the license deal was very important for us and they did us a big favour in completing the deal at that time. As a stop gap measure, [we] agreed internally to put a 1 million$ license deal ... through Logica to allow their cashflow to remain positive and they would pay the due invoices. However, [this] deal will only be $400K this quarter and would not be enough to keep them positive without some commitment on the services side."

90.     On or about September 20, 2001, J.T. sent another e-mail to McQuillin and others in which he stated, in part: "We have mad[e] a commitment of $2.5M per year of services for

23

three years to Logica. In return they prepurchased $2M of licenses at an important time for AspenTech. ... We agree that we want to avoid any write off from Logica, particularly in a difficult quarter such as Q1. The invoice for the next license payment from Logica is due on September 30 2001. ... We agreed we need to find a profile of license/service business that helps to cover Logica's cashflow issue and allow them to make payments. ... [A deal] at $207K is an option to put through Logica to manage the cashflow issue."

91.     On or about November 3, 2001, McQuillin sent an e-mail to several Aspen employees (on which he copied Zappala). In the November 3, 2001 e-mail, McQuillin stated, in part: "What is the status on Logica? ... There cannot be anymore 'license for services' swapping which means we have to get services booking to them to execute. ... Please advise the status including confirmation that we are on track for Q2."

92.     On or about November 8, 2002, B.M., a Vice-President of Finance at Aspen sent an e-mail to Zappala. In the November 8, 2002 e-mail, B.M. stated, in part: "Th[e] [Logica] license deal for around GBP 1.5m has been tied to a services agreement between Logica and Aspen, (either directly through the service agreement or through some sort of side agreement – I am not yet sure which), whereby Logica effectively believes that they have no obligation to pay the half-yearly installments unless they get a certain minimum level of services work from Aspen. Aspen would appear to be in breach of the services agreement as we have not delivered the minimum services work that is required."

93.     B.M. also noted, in part, in the November 8, 2002 e-mail to Zappala: "I am very concerned that a material portion of our accounts receivable/installments receivable balances on our current balance sheet may not be defensible. ... I have grave concerns about this balance

24

sheet being used to solicit further investment in the company at this time given the current investment community sentiment. The consequences for the company, its officers and directors could be very serious. ... [G]iven what I currently know I would not be able to say to D&T [Deloitte & Touche] or the audit committee that I do not have any concerns with respect to the accuracy of the financial statements included in the 10Q."

94.     On or about March 31, 2003, Zappala signed a termination agreement on Aspen's behalf with Logica. The agreement terminated all existing agreements between Aspen and Logica.

95.     The $1.75 million in revenue from the Logica transaction was improperly recorded on Aspen's books and records and reported on a Form 10-Q for the quarter ended December 31, 2000 (Aspen's fiscal second quarter). The Form 10-Q was signed by Zappala and filed with the Commission on February 14, 2001.

96.     The revenue from the Logica transaction should not have been recognized in the quarter ended December 31, 2000 because Logica's payment for the licensed software was contingent upon Aspen providing Logica with a minimum amount of software implementation services revenue by finding customers who would purchase such services from Logica. As such, the earnings process was not complete, collectibility was not probable and the license fee was not fixed or determinable.

97.     On or about January 24, 2001, Aspen issued a press release that falsely and inaccurately summarized its financial results for the fiscal second quarter ended December 31, 2000. The press release also quoted Evans as stating that: "We were pleased to see continued strong license revenue growth this quarter across a broad base of business ... ."

98.     Evans, McQuillin and Zappala knew, or were reckless in not knowing, that the recognition of license revenue from the Logica transaction in the quarter in which it was recognized was improper.

99.     The revenue from the Logica transaction totaled approximately 4.3% of Aspen's license revenue for the quarter ended December 31, 2000. The misstatements caused by the improper revenue recognition were material.

100.    Aspen's earnings release for the quarter indicated that its pro forma net income, excluding charges for in-process R&D and write-offs of investments and amortization of goodwill was $3.1 million, or $0.10 per share, which beat the consensus analyst estimate of $0.07 per share. Had the revenue from the Logica transaction not been recorded in the quarter ended December 31, 2000, Aspen would have been forced to report pro forma net income of $1.4 million, or $0.05 per share.

101.    Immediately after entering into the SLA, on December 31, 2000, Aspen sold the Logica payment stream to a financial institution. Logica made two payments, but when Logica failed to make payments, Aspen made payments on behalf of Logica. Aspen wrote off against revenue the amounts it had paid on Logica's behalf, $727,000 in the quarter ended December 31, 2002, $758,000 in the quarter ended March 31, 2003, and $266,000 in the quarter ended June 30, 2003.

102.    In or about March 2005, Logica was one of the transactions restated by Aspen following completion of the internal investigation by its audit committee.

103.    The Logica transaction was one of four transactions referred to by Aspen (but not by name) in the press release it issued on October 27, 2004 noting that its audit committee had

commenced an internal investigation.

104. The effect of the improper accounting for the Logica transaction was to overstate net income for the quarter ended December 31, 2000 and for the year ended June 30, 2001 by $1.75 million, or $0.05 per share and to understate net income by $727,000 ($0.02 per share), $758,000 ($0.02 per share), and $266,000 (0.01 per share) in the quarters ended December 31, 2002, March 31, 2003, and June 30, 2003 respectively.

## IBM: First Transaction

105. Aspen, acting through the individual defendants, improperly recognized $2.8 million of software license revenue in its fiscal quarter ended December 31, 2000 on a sale to IBM Corporation ("IBM") because (i) an IBM employee signed the software license agreement in January 2001 but dated it December 2000 and (ii) IBM's anticipated payment to Aspen was contingent on Aspen finding end-users to whom IBM would resell Aspen's software.

106. Aspen and IBM entered into a Software License and Service Agreement ("SLA") dated December 29, 2000. Zappala signed the SLA on Aspen's behalf.

107. Pursuant to the SLA, Aspen "acknowledge[d] that IBM [was] purchasing [the relevant Aspen] licenses for assignment to certain customers in connection with IBM's performance of [certain] services projects[.]"

108. Pursuant to the SLA, IBM was required to pay Aspen $2,750,000 in license fees by January 15, 2001. In addition, pursuant to the SLA, IBM "acknowledge[d] and agree[d] that IBM must make payment to AspenTech regardless of the fact that IBM may not use the Software itself and whether or not IBM is able to assign the Software to third party end users." IBM did not make the required license fee to Aspen until on or about April 16, 2001.

27

109.    Aspen recorded on its books and records and recognized the $2,750,000 license fee in the quarter ended December 31, 2000 (Aspen's fiscal second quarter).

110.    In or about Christmas 2000, Evans contacted E.L., an IBM employee, in an attempt to persuade him to purchase approximately $3 million in software. Evans told E.L. that Aspen would arrange for end-users to purchase the Aspen software. Evans also told E.L. that, if IBM was unable to re-sell all of the software, Aspen would arrange financing for the transaction.

111.    On or about January 3, 2001 (i.e., after the end of the second fiscal quarter), Zappala arranged for W.T., an in-house attorney at Aspen, to draft an SLA related to the IBM transaction which Evans had been negotiating. Various drafts of the SLA were sent by W.T. to L.K. and D.P., IBM officials, between January 4-8, 2001.

112.    On or about January 5 or 6, 2001, N.C., an Aspen salesman, conducted a conference call with Evans, Zappala, McQuillin and others, during which the salesman presented a status update on the IBM transaction and indicated that the transaction was not yet complete.

113.    On or about January 6, 2001, Evans sent an e-mail to McQuillin to which was attached a "Sales Action Plan." In the "Sales Action Plan," Evans stated, in part: "Manage the Q2 Close and Explanation ... Don't take ... IBM – [it's] not revenue, we're still negotiating. Explain what happened and what it means[.]"

114.    Evans also stated, in part, in the "Sales Action Plan" attached to his January 6, 2001 e-mail to McQuillin: "Need to Understand ... Why we fell short in Q2 ... Why we didn't anticipate it and take corrective action sooner[.]"

115.    Evans also stated, in part, in a document attached to his January 6, 2001 e-mail to McQuillin that he intended to assist Zappala in finalizing "Q2 revenue" and in developing an

28

"explanatiion [sic] for what happened in Q2[.]"

116. On or about January 6, 2001, L.K., an IBM employee, e-mailed a draft of Aspen's proposed SLA to the head of IBM's procurement department. L.K. noted, in part, in the January 6, 2001 e-mail that: "AspenTech needs to realize the $3M sale in Dec. 2000 business, and they are willing to make some extraordinary concessions for this."

117. On or about January 7, 2001, D.P., an IBM official, telephoned Evans and informed him that IBM did not intend to proceed with the anticipated transaction with Aspen.

118. On or about January 8, 2001, G.W., an IBM procurement official, responded to L.K.'s January 6, 2001 e-mail by noting, in part, that Aspen's proposed deal was designed for "Aspen to create revenue recognition" and that IBM would not agree to Aspen's proposed terms.

119. On or about January 8, 2001, G.W., the IBM procurement official, told W.T., the in-house attorney at Aspen, that any proposed transaction would have to be memorialized in an IBM form contract and be "within the bounds of proper business conduct."

120. On or about January 8, 2001, Evans spoke, via telephone, to N.C., an Aspen Vice-President for Strategic Relationships, and, among other things, asked him if Aspen and IBM were continuing to negotiate. During the January 8, 2001 telephone conversation, N.C. told Evans that Aspen and IBM were continuing to negotiate.

121. On or about January 9, 2001, McQuillin sent an e-mail to Evans and N.C., the Aspen Vice-President for Strategic Relationships, which included a "call script" for a telephone call which Evans was to make to K.S., an IBM official. Among other things, the "call script" stated that Evans was to note that he had "been working personally ... over the past 6 months on various activities kicking off [the Aspen-IBM] alliance for the process industries." In addition,

29

the "call script" stated that Evans was to "very briefly review where [Aspen and IBM were] at in [the] process to complete the deal [they had] been working on ... over the past several days." The "call script" also stated that Evans was to note that, under the proposed deal's terms, "there is a $3M license commitment to AspenTech in return for which [Aspen] will give IBM ... right of first refusal on ... services work in defined accounts[.]" The "call script" also stated that Evans was to note that IBM's "commission rate would be doubled from 5% to 10% for up to $10M in license revenue sold by the alliance." The "call script" also indicated that Evans was to discuss "the projects that ... would most likely work off the $3M payment in the next 90-120 days[.]" The "call script" also indicated that Evans was to note that the "goal [was] to complete the transaction by end of day tomorrow" and that "[Aspen] ha[s] a license document drafted and ready for signature which is the document [Aspen] need[s] for revenue recognition."

122. On or about January 9, 2001, Evans and McQuillin placed a telephone call to K.S., the IBM official, to continue negotiations.

123. On or about January 9, 2001, W.T., the in-house attorney at Aspen, e-mailed, among other things, the latest version of the SLA, to Evans and McQuillin.

124. On or about January 13, 2001, Evans telephoned E.L., an IBM general manager based in the United Kingdom and, among other things, told him that, should IBM sign the proposed SLA, Aspen would arrange to book software sales through IBM so that it could reach the license revenue figure in the proposed SLA. Evans also told E.L. that Aspen would finance any shortfall so that the license revenue target could be reached by IBM.

125. On or about January 15, 2001, J.T., an Aspen salesman, met with an IBM employee based in the United Kingdom. J.T. asked the IBM employee to sign the SLA on or

about January 15, 2001, but to date it December 29, 2000 so that Aspen could recognize the revenue in the prior quarter. As requested, the IBM employee signed the SLA on or about January 15, 2001 and dated the SLA December 29, 2000.

126.    On or about January 25, 2001, C.D., Aspen's Assistant Treasurer, sent an e-mail to McQuillin, on which he copied Evans, Zappala and others. In the January 25, 2001 e-mail, C.D. stated, in part: "AspenTech expects some big deals ... will be passed to IBM in order to be sure IBM will get 3M$ License orders from AspenTech Customers. In addition to this commitment to bring License deals to IBM, we have also agreed to double the commission rate we pay up to 10M$ of license revenue sold through our alliance." With respect to the IBM transaction, C.D. also stated, in part, in the January 25, 2001 e-mail that "[f]inalizing the paperwork and contracts" still needed to occur.

127.    On or about March 25, 2001, McQuillin sent an e-mail, whose subject line was "Follow-Up - IMPORTANT," to the IBM employee who had signed the SLA on IBM's behalf. Among other things, McQuillin noted in the March 25, 2001 e-mail that: "I had a chance to follow-up with Lisa Zappala, our CFO, following our Thursday telecon regarding payment timing. ... The track we discussed on Thursday would have IBM making payment to AspenTech either after IBM had invoiced the customer OR after IBM had actually been paid by the customer. In either case, this would push the date by which Aspen Tech would receive full payment from IBM to mid-to-late April in the best case, if not longer. This timing will cause a major problem with our auditors. From their perspective payment was due latest March 31st ... We do believe we have teed up the deals necessary to clear the entire IBM pre-purchase this quarter ... . However, I do not see any way to process the paperwork such that AspenTech would

31

receive payment by March 31st from IBM. Therefore, we believe the only path forward we have is for IBM to finance the pre-purchase to enable IBM to pay us the full amount by March 31st. We are fully prepared to pay the finance charges ourselves ... ."

128.    On or about March 27, 2001, McQuillin forwarded a copy of the March 25, 2001 e-mail which he had sent to the IBM employee, to, among others, Evans and Zappala. McQuillin stated, in part, in his forwarding e-mail of March 27, 2001: "Larry [Evans], please talk to [C., an IBM official] ASAP. We need to get a PO from IBM - a financing agreement."

129.    On or about March 30, 2001, an IBM employee signed an audit confirmation letter (dated January 29, 2001) that was eventually sent to Aspen's outside auditors. This audit confirmation letter was materially false because, among other things, it falsely indicated that there had been no "contingencies, amendments or modifications to the original agreement [SLA], side agreements (verbal or written) or expected future concessions under [the] agreement [SLA] with the Company[.]"

130.    On or about April 4, 2001, C.D., Aspen's Assistant Treasurer, forwarded an e-mail from C.H., an IBM official, to McQuillin and Zappala. C.H. had stated, in part, in his e-mail to C.D. that: "IBM will make our best efforts in obtaining payments to AspenTech as soon as possible, but we have not committed to a payment of $2.75M by April 15[.]"

131.    On or about April 4, 2001, C.D., Aspen's Assistant Treasurer, also sent an e-mail, which had been labeled "Confidential" and of "High" importance, to McQuillin (on which he copied Evans, Zappala and others). In the April 4, 2001 e-mail, C.D. noted, in part, that: "IBM made no commitment to pay AspenTech $2.75M by 4/15/01. ... In addition, do you want me to move another order or two (2) through IBM so that we can collect at least $2.75M? ... I will call

32

and review this with you and Lisa [Zappala]."

132.    On or about April 11, 2001, C.D., Aspen's Assistant Treasurer, sent an e-mail to McQuillin (on which he copied Evans, Zappala and others). In the April 11, 2001 e-mail, C.D. stated, in part: "Audit Letter – [the IBM employee who had signed the SLA] agreed to sign Audit Letter and return to AspenTech by Monday, 4/16/01."

133.    On or about January 30, 2002, an IBM employee signed another audit confirmation letter (dated January 29, 2002). This audit confirmation letter was also materially false because, among other things, it falsely indicated that there had been no "contingencies, amendments or modifications to the original agreement [SLA], side agreements (verbal or written) or expected future concessions under [the] agreement [SLA] with the Company[.]"

134.    The January 29, 2002 audit confirmation letter was also materially false because it falsely indicated that the SLA had been signed by IBM on December 29, 2000.

135.    On or about January 30, 2002, Zappala faxed the materially false January 29, 2002 audit confirmation letter to Aspen's auditors.

136.    On or about February 4, 2002, at the request of Zappala, an IBM employee signed a third audit confirmation letter (dated February 1, 2002) that was also eventually sent to Aspen's outside auditors. This audit confirmation letter was also materially false because, among other things, it falsely indicated that there had been no "contingencies, amendments or modifications to the original agreement [SLA], side agreements (verbal or written) or expected future concessions under [the] agreement [SLA] with the Company[.]"

137.    The February 1, 2002 audit confirmation letter was also materially false because it falsely indicated that the SLA had been signed on December 28, 2000. Zappala had provided the

blank February 1, 2002 audit confirmation letter to the IBM employee.

138.    The $2.75 million in license revenue from the IBM transaction was improperly recorded on Aspen's books and records and reported on Aspen's Form 10-Q for the quarter ended December 31, 2000, which was signed by Zappala and filed with the Commission on or about February 14, 2001.

139.    Aspen should not have recognized the $2.75 million in license revenue in the quarter ended December 31, 2000 for at least the following reasons: (i) the SLA was actually signed by IBM on or about January 15, 2001 but was dated by IBM December 29, 2000 and (ii) IBM's anticipated license payment to Aspen (due January 15, 2001) was, despite the language in the SLA, contingent upon Aspen finding end-users to whom IBM would resell Aspen's software. Thus, at the time Aspen recognized the $2,750,000 in license revenue, there was not persuasive evidence of an arrangement, the fee was not fixed or determinable, collectibility was not probable and the earnings process was not complete.

140.    On or about January 24, 2001, Aspen issued a press release that falsely and inaccurately summarized its financial results for the fiscal second quarter ended December 31, 2000. The press release also quoted Evans as stating that: "We were pleased to see continued strong license revenue growth this quarter across a broad base of business ... ."

141.    Evans, McQuillin and Zappala knew, or were reckless in not knowing, that the recognition of license revenue from this IBM transaction in the quarter in which it was recognized was improper.

142.    The misstatements caused by the improper revenue recognition were material. The IBM transaction totaled approximately 7% of Aspen's license revenue for the quarter ended

34

December 31, 2000.

143. Aspen's earnings release for the quarter indicated that its pro forma net income, excluding charges for in-process R&D and write-offs of investments and amortization of goodwill, was $3.1 million, or $0.10 per share, which beat the consensus analyst estimate of $0.07 per share. Had the revenue from the IBM transaction not been recorded in the quarter ended December 31, 2000, Aspen would have been forced to report pro forma net income of approximately $350,000, or $0.01 per share.

144. With Aspen's assistance in locating customers, the product sold through to end users, and Aspen received payment from IBM in its fourth quarter of fiscal 2001. The revenue would have been properly recorded in that quarter.

145. In or about March 2005, IBM was one of the transactions restated by Aspen following completion of the internal investigation by its audit committee.

146. As such the effect of the improper accounting for this IBM transaction was to overstate net income for the quarter ended December 31, 2000 by $2.75 million, or $0.09 per share, and to understate net income for the quarter ended June 30, 2001 by $2.75 million, or $0.09 per share. There was no effect on the cumulative net loss for the year ended June 30, 2001, because both misstatements occurred in the same fiscal year.

147. Without both the Logica transaction and this IBM transaction, for the quarter ended December 31, 2000 Aspen would have had to report a pro forma net loss of $1.4 million. Rather than reporting pro forma earnings per share of $0.10 per share, Aspen would have reported a loss per share of $0.05 per share.

## IBM: Second Transaction

35

148.    Aspen, acting through the individual defendants, improperly recognized $1.7 million of software license revenue in its fiscal quarter ended March 30, 2002 on a sale to IBM. The revenue recognition was improper because there was a verbal agreement between Aspen and IBM pursuant to which (i) IBM only intended to pay Aspen if an end-user was committed to purchase the software and (ii) it was expected that Aspen would devote significant efforts to have an end-user re-purchase the software.

149.    At least as early as March 2002, Aspen began negotiating a transaction with an Italian company called AgipPetroli SpA ("AGIP").

150.    On or about March 5, 2002, R.H., an Aspen salesman, sent an e-mail to S.P. and J.A., two Aspen accounting officials (on which he copied Zappala). In the March 5, 2002 e-mail, R.H. stated, in part: "We are in the closing stages of completing a deal with AGIP. ... The deal is most likely to be sold through IBM as they have an existing agreement with AGIP ... . The timing of AGIP deal will mean we run close to the end of Q3. My question is, if IBM sign [sic] up the deal with us in March but the AGIP deal with IBM completes in early April, would we be able to recognize the deal in Q3? IBM would purchase the software on behalf of AGIP as part of the larger project. Let me know asap, as this has a bearing on how much pressure we put on AGIP."

151.    On or about March 8, 2002, Zappala responded to R.H.'s March 5, 2002 e-mail. In the March 8, 2002 response e-mail, Zappala stated, in part: "We have tried this several times with IBM and it hasn't worked as they always want the end customer to be committed before they are committed - SO I am willing to give it a try but don't count on it!!"

152.    On or about March 8, 2002, R.H. responded to Zappala's March 8, 2002 e-mail by

stating, in part: "I agree, we will push AGIP very hard to have IBM's deal done. I am just trying to cover all the bases to have IBM set up to sign either way in March. ... [I]t may need David's [McQuillin] help for some assurances of a continued relationship with IBM."

153.    On or about March 8, 2002, Zappala forwarded the March 5, 2002 e-mail from R.H. (and the follow-up e-mail string) to McQuillin and another Aspen official with a note stating: "THis [sic] is risky!!"

154.    On or about March 21, 2002, McQuillin sent an e-mail to E.L., an IBM general manager. In the March 21, 2002 e-mail, McQuillin stated, in part: "As we are going for a Corporate deal with Agip, rather than a single refinery, the timeline to close this deal will push from March 30 to mid-April. We want this deal for our March 30 quarter and would like IBM to pre-purchase the software license now. In return we will give IBM a $500K commission. In addition, this will guarantee IBM a significant share in the services which total over $4M. All the business will go through IBM which will help us towards our $20M Alliance target for this year. Lastly, this will ... allow us to build excitement and momentum in our respective organizations. ... Since this would be a simple pre-purchase for a specific named client the paperwork is straightforward and has already been prepared."

155.    On or about March 22, 2002, McQuillin forwarded his March 21, 2002 e-mail to E.L. to, among others, Evans and Zappala. In his forwarding e-mail of March 22, 2002, McQuillin stated, in part: "[T]hey (IBM) are getting mixed signals from Agip. ... IBM has a meeting for Tuesday next week ... to try to pin Agip down[.]"

156.    On or about March 22, 2002, J.T., an Aspen salesman, sent an e-mail to McQuillin (on which he copied Evans, Zappala and others). In the March 22, 2002 e-mail, J.T.

stated, in part: "In our [anticipated] License Agreement [with IBM] it is already stated that the license are for AGIP or for any other customer we agree on ... . I recommend that you tell [E.L., the IBM general manager] that we are sure that AGIP is going for 5 refineries and that statement is shared by the IBM team in Italy. We could agree to go for less than 2M$ in a PrePurchase agreement ... . Flexibility is already integrated in the paperwork."

157. On or about March 28, 2002, Aspen and IBM entered into a Software License and Service Agreement ("SLA"). E.L., the IBM general manager, signed the SLA on IBM's behalf.

158. The SLA stated, in part, that IBM "may assign this license to [AGIP] or other mutually acceptable customer ... ."

159. The SLA required IBM (or its assignee) to make the required $1.7 million license payment (denominated in Euros) within 90 days (or by June 26, 2002) to Aspen. IBM did not make any payment to Aspen pursuant to the SLA until in or about December 2002 and made a third (and final) payment to Aspen pursuant to the SLA in or about May 2003.

160. On or about May 18, 2002, D.A., Aspen's head of sales, sent an e-mail to J.T., an Aspen salesman (on which she copied Zappala and others). In the May 18, 2002 e-mail, whose subject line was "IBM prebuy," D.A. stated, in part: "Please let us know the plan for backfilling this prebuy. I understand the amount of Agip is significantly less than originally thought."

161. On or about May 21, 2002, J.T. sent an e-mail response to D.A.'s May 18, 2002 e-mail (on which he also copied Zappala and others). In the May 21, 2002 e-mail, J.T. stated, in part: "The goal is to have a firm [AGIP] order to IBM ASAP (end of May?) for the first part (~1m$) and a clear commitment in writing for the second part (800k$). ... In case of problems we should pass the 300k$ RTOPT AGIP deal through IBM to partially backfill the remaining

38

part."

162. On or about May 24, 2002, J.L., an Aspen official, sent an e-mail to Evans, on which he copied McQuillin, Zappala and others. In the May 24, 2002 e-mail, J.L. stated, in part: "I have been working on the following deals to make sure we get payment by [end] of quarter. ... AGIP. AGIP has committed to one half of the deal (900K)[.] We still have the issue of [E.L.] paying us because he claims that there was an understanding between him and us that he had to have cash before he paid us. So, we are looking to see if IBM finance can get him the cash so he can pay us. ... [We] are looking at three ... deals that IBM will finance[.] ... This would allow [E.L.] to carry the finance charge but get us the cash and then get the AGIP cash by Sept."

163. On or about June 10, 2002, McQuillin sent an e-mail to J.L., on which he copied Evans, Zappala and others. In the June 10, 2002 e-mail, McQuillin stated, in part: "[A]s you know, working off the IBM ... License Purchase[] from last quarter is mission critical for Q4 - failure is not an option. To provide the necessary visibility into this activity I want you to begin publishing DAILY e-mail updates effective today."

164. On or about June 28, 2002, A.C., Aspen's Treasury Manager, sent an e-mail to Zappala and others. In the June 28, 2002 e-mail, A.C. stated, in part: "Are we still on board with executing IBM this qtr? I have engaged GE Capitals UK office and they will be pushing hard to get everything done and executed for Monday latest Tuesday. Please keep me posted as this deal progresses and provide me with any docs/po's that exist."

165. On or about Monday, July 1, 2002, J.T., the Aspen salesman, sent an e-mail to Zappala and others. In the July 1, 2002 e-mail, J.T. stated, in part: "Lisa [Zappala] ... The current situation is as follows: - AGIP would sign the Master Agreement with IBM tomorrow Tuesday

39

... Worst case: IBM will issue a PO for 648k$ sooner on Wednesday, payment within a max of 30 days ... Best case (supported by [E.L.]): IBM issue a PO with two part - first one: 648k$ payable within 30 days - second part payable in March/April 03 1142k$."

166.    On or about Monday, July 1, 2002, J.T. sent a second e-mail to Zappala and others. In the July 1, 2002 e-mail, J.T. stated, in part: "Lisa [Zappala] ... Few minutes ago, I had a call with [E.L.]. He has confirmed that he will personally require IBM-Italy to issue a PO for 1.8m$ as soon as AGIP sign the Master Agreement (tomorrow Tuesday?)."

167.    On or about September 9, 2002, J.T., the Aspen salesman, sent an e-mail to McQuillin, on which he copied Zappala and others. In the September 9, 2002 e-mail, J.T. stated, in part: "Now all admin people from Agip are back from holiday and should process the order to IBM this week. ... [E.L.] committed to give us a non-revocable order for 1.8m$, as soon as I would get the Agip PO."

168.    On or about September 13, 2002, J.T., the Aspen salesman, sent an e-mail to Evans, on which he copied Zappala and others. In the September 13, 2002 e-mail, J.T. summarized the history of the Aspen-IBM relationship with respect to the March 28, 2002 SLA. J.T. noted, in part, in the September 13, 2002 e-mail: "March 2002: [E.L.] signed a 1.8m$ License Pre-purchase Agreement [on IBM's behalf] to be resold to AGIP. AspenTech had exerted a very high pressure on [E.L.] to sign the document as IBM Italy did not agree to do it before any commitment from AGIP. ... Efforts has been make [sic] by IBM in Italy and by us to get the signature by AGIP as soon as possible to allow IBM to proceed."

169.    On or about September 16, 2002, Zappala sent an e-mail to Evans and McQuillin. In the September 16, 2002 e-mail, Zappala admitted, with respect to the March 28, 2002 SLA,

that "[w]e have reached a critical milestone here ... . [I]t looks now like we do not have a firm payment obligation from IBM ... ."

170.    On or about September 26, 2002, Evans sent an e-mail to McQuillin, Zappala and others. In the September 26, 2002 e-mail, Evans stated, in part: "Agip is to issue a purchase order to IBM ... . [T]hey expect the purchase order to go to IBM today. ...  Once IBM ... receives the purchase order from Agip, they will issue a purchase order to AspenTech ... with firm payment dates."

171.    On or about Monday, September 30, 2002, J.T. sent an e-mail to Evans, on which he copied McQuillin, Zappala and others. In the September 30, 2002 e-mail, J.T. stated, in part: "IBM has received the electronic copy of the agreement with AGIP.  IBM is expecting the original signed paper copy for today Monday evening."

172.    On or about October 14, 2002, McQuillin sent an e-mail to Evans and J.T., on which he copied Zappala. In the October 14, 2002 e-mail, whose subject line was "AGIP," McQuillin stated, in part: "I spoke to [E.L.] on the 9th. ... [H]e was unable to give me a clear game plan for getting this matter resolved. ...  I pushed [him] to make clear we cannot be forced to de-book this revenue - we have to get it paid. Again, I could not get a clear path to closure."

173.    On or about October 23, 2002, J.T. sent an e-mail to McQuillin, on which he copied Evans, Zappala and another Aspen employee. In the October 23, 2002 e-mail, whose subject line was "AGIP," J.T. stated, in part: "We are still working to be able to get the 1.8m$ guaranteed."

174.    On or about November 8, 2002, B.M., a Vice President of Finance at Aspen, sent an e-mail to Zappala. In the November 8, 2002 e-mail, B.M. stated, in part, with respect to the

41

March 28, 2002 SLA: "This contract for around $2m is a pre-buy by IBM in anticipation of selling the software on to Agip. Agip has since reduced the amount of software they were prepared to buy to less than $1m. As far as I know there is no side letter associated with this deal, but IBM none the less is refusing to pay for this software without a customer to sell it on to as they feel that there was an understanding that this would be the case. ... The remaining balance of $1.1 due under this contract is therefore not collectable in the short term without finding someone else for IBM to move this software on to. This again implies that the revenue on this deal has been prematurely recognized."

175.    On or about December 1, 2002, J.T. sent an e-mail to McQuillin, on which he copied Evans, Zappala and another Aspen employee. In the December 1, 2002 e-mail, whose subject line was "AGIP," J.T. stated, in part: "**On Oct 4** we got the firm order for the first part, 644,800$. After several problems the shipment has been done on **Nov 21**, and received by the customer on Nov 26th. ... IBM agreed to issue a PO for the remaining 1.115.200$, to be delivered and invoiced in March 2003, but **with the condition** that IBM will receive the corresponding PO from their end-used AGIP." (emphasis in original).

176.    On or about December 18, 2002, McQuillin sent an e-mail to S.C., a Vice President of Field Sales at Aspen and to J.T., the Aspen salesman (on which he copied Evans, Zappala and others). In the December 18, 2002 e-mail, whose subject line was "AGIP/IBM Receivable - URGENT," McQuillin stated, in part: "Bottom line, we do not have what we need from IBM at this point to avert a write off of the license deal for Agip. ... IBM needs to know that if we have to take this write off we will sell the license directly to Agip and take the margin ourselves. There is NO incentive for us to still sell this through IBM. Obviously we want to

42

preserve this revenue, but time is running out."

177.    The $1.7 million license revenue from this IBM transaction was improperly

recorded on Aspen's books and records and reported on Aspen's Form 10-Q for the quarter

ended March 31, 2002, which was signed by Zappala and filed with the Commission on or about

May 15, 2002.

178.    The license revenue from this IBM transaction should not have been recognized

up-front for at least two independent reasons: (1) there was an understanding between Aspen and

IBM that IBM only intended to pay Aspen if AGIP or another end-user was committed to

purchasing the Aspen software and (2) there was an understanding between Aspen and IBM that

Aspen would devote significant efforts and/or resources attempting to have AGIP or another end-

user re-purchase the Aspen software from IBM. As such, the earnings process was not complete,

collectibility was not probable, and the license fee was not fixed or determinable.

179.    On or about April 25, 2002, Aspen issued a press release that falsely and

inaccurately summarized its financial results for the fiscal third quarter ended March 31, 2002.

The press release also quoted Evans as stating that: "We are one hundred percent committed to

doing whatever it takes to restore AspenTech to sustained profitability ... ." The press release

also noted that Aspen "signed nine license transactions in the third quarter of approximately $1

million or greater."

180.    Evans, McQuillin and Zappala knew, or were reckless in not knowing, that it was

improper for Aspen to recognize revenue from this IBM transaction in the quarter in which it was

recognized.

181.    The misstatements caused by the improper revenue recognition were material.

43

The revenue from the IBM transaction totaled approximately 4.7% of Aspen's license revenue for the quarter ended March 31, 2002.

182.    Aspen's earnings release for the quarter indicated that its pro forma net loss, excluding the dilution of preferred stock discount and dividend was $4.9 million, or $0.15 per share, which missed the consensus analyst estimate of a loss of $0.11 per share by $0.04. Had the revenue from the IBM transaction not been recorded in the quarter ended March 31, 2002, Aspen would have been forced to report a pro forma net loss of $6.7 million, or $0.21 per share, missing the consensus analyst estimate by $.10 per share.

183.    The consensus analyst expectation concerning Aspen's total revenue for the quarter ended March 31, 2002 was $83.1 million. Aspen exceeded the consensus analyst expectation by reporting total revenue of $83.47 million. Without the improperly recognized revenue from this IBM transaction, Aspen would have missed the consensus analyst expectation by approximately $1.4 million.

184.    Eventually partial sales to end users resulted from this IBM transaction. As such, the $529,000 should have been recorded as revenue in the quarter ended December 31, 2002 and $947,000 in the quarter ended March 31, 2003.

185.    In or about March 2005, IBM was one of the transactions restated by Aspen following completion of the internal investigation by its audit committee.

186.    The effect of the improper accounting for this IBM transaction was to overstate net income for the quarter ended March 31, 2002 and the year ended June 30, 2002 by $1.7 million, or $0.05 per share, and to understate net income for the quarters ended December 31,

44

2002 and March 31, 2003 by $529,000 and $947,000, or $0.01 and $0.02 per share respectively.

## Yukos

187.    Aspen, acting through the individual defendants, improperly recognized $4.3
million of software license revenue in its fiscal quarter ended June 30, 2001 on a sale to Yukos
Corp. ("Yukos"), a Russia-based petroleum company, because (i) Yukos signed the software
license agreement in July 2001 but dated it in June 2001 and (ii) McQuillin entered into a side
agreement with Yukos creating contingencies to Yukos's payment obligations that were not
reflected in the software license agreement.

188.    On or about June 27, 2001, McQuillin sent an e-mail to Evans and Zappala related
to a potential Software License and Service Agreement ("SLA") with Yukos. In the June 27,
2001 e-mail, McQuillin noted, among other things, that the "final scope and price will be
finalized on July 4th" and that he wanted Yukos to sign the SLA on July 4 "with a June 30th
agreement date."

189.    In or about July 2001, McQuillin spent approximately 15 days in Moscow, Russia
negotiating with Yukos.

190.    On or about July 5, 2001, McQuillin sent an e-mail from Moscow to Evans,
Zappala and another Aspen official. McQuillin attached a draft letter (dated July 5, 2001) to
Yukos' president to the July 5, 2001 e-mail. McQuillin stated, in part, in the July 5, 2001 e-mail:
"Please destroy after reading."

191.    In the draft July 5, 2001 letter to Yuko's president (attached to McQuillin's July 5,
2001 e-mail), McQuillin proposed, in part, that Yukos sign the contemplated SLA by July 10,
2001. McQuillin also stated, in part, in the draft July 5, 2001 letter: "As a quarterly driven

software company, our business model requires that we book significant software license revenue. ... By [Yukos] committing to the software license agreement [by July 10, 2001] ... we can recognize the revenue for our fiscal year ending June 30, 2001 ... ."

192.   On or about July 10, 2001, McQuillin sent an e-mail to R.K., a Yukos official. McQuillin attached several documents to the July 10, 2001 e-mail, including a draft SLA and a document he referred to (in caps) as "THE DRAFT SIDE LETTER." McQuillin stated, in part, in the July 10, 2001 e-mail that the draft side letter gives "the right to Yukos to cancel the software license agreement [SLA] in the event that we do not come to final agreement on the Alliance."

193.   McQuillin also stated, in part, in the July 10, 2001 e-mail to R.K., the Yukos official, that the "approach" outlined therein was a "win/win for both companies" because, among other things, it allowed Aspen "to recognize the license revenue for [its] year ending June 30, 2001." McQuillin also stated, in part, in the July 10, 2001 e-mail: "Yukos has no financial risk as the Software License Agreement is not valid until we reach final agreement on August 1st. ... To proceed we would need the Software License Agreement signed tomorrow, or latest Friday - BUT remember, it's only a draft! We have until August 1st for it to be binding ... ."

194.   The draft side letter, which McQuillin attached to the July 10, 2001 e-mail to R.K., the Yukos official, stated, in part, that "Yukos will sign the [SLA] by Wednesday of this week, latest Friday of this week, dated June 30, 2001. This will allow AspenTech to recognize the revenue for our fiscal year ended June 30, 2001." The draft side letter also stated, in part, that Yukos would have "the unconditional right to cancel the [SLA] in the event that the two companies cannot reach final agreement by August 1, 2001, without any liability or cost

46

incurred."

195.    In or about mid-July 2001 (at about the time the SLA was purportedly entered into between the parties), McQuillin entered into a side agreement (backdated to June 30, 2001) on Aspen's behalf with Yukos. Among other things, the side agreement gave Yukos the "unconditional right[]" to withdraw from the SLA if the parties failed to reach any one of three additional agreements by August 1, 2001. The parties failed to enter into any of the additional agreements referenced in the side agreement. As such, Yukos had no obligation to purchase any software from Aspen pursuant to the SLA.

196.    Pursuant to the June 30, 2001 side agreement, Aspen was required to "undertake to return" any monies received from Yukos pursuant to the SLA if Yukos withdrew from the SLA as a result of the parties' failure to reach one of the three additional agreements referenced in the side agreement.

197.    On or about July 15, 2001, McQuillin sent an e-mail to several Aspen employees. In the July 15, 2001 e-mail, McQuillin stated, in part: "Attached is a draft Yukos negotiation team and timeline that I put together with [Yukos]. ... FAILURE TO CLOSE THE ALLIANCE DEAL BY AUGUST 1st IS NOT AN OPTION ... I had to commit to come back personally as well the last week of July to get the deal done, ... and I will come back."

198.    On or about July 16, 2001, McQuillin sent an e-mail to S.O., a Yukos official, thanking Yukos for "getting the alliance and software license agreements signed last Friday [July 13]."

199.    On or about August 3, 2001, D.M., a Sales Account Manager at Aspen, sent an e-mail, the subject line which was "Comfort Letter," to McQuillin. In the August 3, 2001 e-mail,

47

D.M. stated, in part: "David [McQuillin], This is what I've got as side-letter draft for [Yukos]."

Attached to the August 3, 2001 e-mail from D.M. to McQuillin was a draft side-letter which,

among other things, stated: "I would like Yukos to agree to sign the license agreement for the

software required for the planning and logistics part of the project by Wednesday of this week. ...

If we are unable to complete the paperwork by the 1st August 2001 and Yukos feel that there is

no short-term solution to any differences, Yukos will have the right to cancel the software license

agreement without any liability or cost incurred."

200.    On or about August 3, 2001, a draft e-mail from McQuillin to Yukos was

prepared. In the draft August 3, 2001 e-mail, McQuillin stated, in part: "AspenTech will

officially report it's [sic] fourth quarter financial results on Tuesday August 7th. We need to

include the Yukos software license, that you conditionally signed, in our results to meet our

targets. That is why I pushed so hard with you and Yukos in early July. If we are now forced to

unbook the Yukos deal from our results it will cause extreme damage to AspenTech, our

relationship with Yukos and me personally. This is a very, very serious issue for us."

201.    On or about August 4, 2001, McQuillin sent an e-mail, the subject line which was

"Yukos Letter - Draft" to D.M., the Sales Account Manager at Aspen. In the August 4, 2001 e-

mail, McQuillin stated, in part: "[H]ere's a draft of the side letter for Yukos. ... [P]lease put this

in the form of a letter, on AspenTech letterhead ... . Treat this letter as strictly confidential and

do not further forward via e-mail except ... for translation. Delete all sent e-mails after ...

[translation] and only keep an electronic copy on your machine for the moment."

202.    Attached to McQuillin's August 4, 2001 e-mail to D.M. was a draft side letter.

The draft side letter stated, in part: "We ask that the [SLA] dated June 29, 2001 stand as signed.

48

Yukos will have the right to make changes to the terms and conditions as may be necessary over the next 30-45 days as we complete the final paperwork ... ."

203.    McQuillin and Zappala misled Aspen's auditors about the terms of the Yukos agreement by creating false audit confirmations related to the deal. For example, on or about August 3, 2001, Zappala sent McQuillin an e-mail containing proposed language for Yukos to confirm to Aspen's outside auditors that Yukos was committed to fulfilling its commitments under the SLA. McQuillin then drafted a letter for Yukos to send to Aspen's auditors in lieu of a standard license audit confirmation.

204.    On or about August 7, 2001, a Yukos employee sent a false audit confirmation letter (on which he copied AA, Aspen's outside auditor) to M.B., the Aspen Senior Vice President. The August 7, 2001 audit confirmation letter stated, in part: "Yukos understands your need to reconfirm our license agreement as part of your year-end review with your accounting firm. Yukos confirms its intentions to work according principles of the [SLA] signed June 29, 2001 and confirms that payments are not contingent upon any future events, including possible future deliveries of products or services."

205.    On or about August 7, 2001, Evans, McQuillin, Zappala, and others, all signed a letter to Aspen's auditors which falsely represented that "there are no contingencies, amendments or modifications to the original agreement, side agreements (verbal or written) or expected future concessions under [the SLA] between Aspen and Yukos."

206.    On or about October 5, 2001, McQuillin sent an e-mail to a Yukos official. In the October 5, 2001 e-mail, McQuillin stated, in part: "We have told Yukos repeatedly that we must have a firm, committed license agreement in order to do this program. ... We can and will be as

49

flexible as possible on the structure of the license agreement, but we absolutely must have the first $1.8m license payment in the next couple of weeks. Failure to have this payment will force us to de-book the revenue which will have a disasterous [sic] impact."

207.    On or about October 12, 2001, a Yukos official sent an e-mail to McQuillin in which he stated, in part: "Even in [the] conditionally [signed] agreements of 29 June the payment for the licenses in 2001 was out of the question. ... Yukos's commitment was conditional, we aimed at supporting Aspen Tech in connection with the end of the finance year."

208.    On or about October 15, 2001, McQuillin forwarded to several Aspen employees, including Zappala, the October 12, 2001 e-mail which he had received from the Yukos official. McQuillin stated, in part, in his forwarding e-mail message: "[P]lease forward your understanding of where we are now at in the process of completing the necessary agreements."

209.    The $4.3 million from the Yukos transaction was improperly recorded on Aspen's books and records and reported as revenue in Aspen's Form 10-K for the year ended June 30, 2001, filed with the Commission on or about September 28, 2001. The Form 10-K was signed by Evans and Zappala.

210.    The revenue from the Yukos transaction should not have been recognized because the SLA was not completed and signed in the period of recognition. In addition, other agreements amended or negated the terms of the SLA. As such, there was not evidence of an arrangement, the earnings process was not complete, collectibility was not probable, and the license fee was not fixed or determinable.

211.    On or about August 7, 2001, Aspen issued a press release that falsely and inaccurately summarized its financial results for the fiscal fourth quarter and fiscal year ended

50

June 30, 2001. The press release also quoted Evans as stating that: "We are pleased to have exceeded expectations for both revenues and profitability this quarter in what remains a very difficult environment[.] ... During the quarter ... we closed [a] significant multimillion dollar transaction[] with ... Yukos, a large Russian oil company."

212.    Evans, McQuillin and Zappala all knew, or were reckless in not knowing, that it was improper for Aspen to recognize revenue from the Yukos transaction in the quarter and year in which it was recognized.

213.    The misstatements caused by the improper revenue recognition were material. The revenue from the Yukos transaction totaled approximately 10.7% of Aspen's license revenue for the quarter ended June 30, 2001.

214.    Aspen's earnings release for the quarter and year ended June 30, 2001 indicated that its pro forma net loss for the quarter, excluding one-time acquisition and restructuring charges and amortization of goodwill, was $1.7 million, or $0.06 per share, which beat the consensus analyst estimate pro forma loss of $0.07 per share. Had the revenue from the Yukos transaction not been recorded in the quarter ended June 30, 2001, Aspen would have been forced to report a pro forma net loss for the quarter of $6.0 million, or $0.20 per share.

215.    Aspen's earnings release also indicated that Aspen's pro forma net loss for the year ended June 30, 2001, excluding one-time acquisition and restructuring charges, amortization of goodwill, and an investment write-off, was $3.5 million, or $0.12 per share, which met the consensus analyst estimate pro forma loss of $0.12 per share. Had the revenue from the Yukos transaction not been recorded in the year ended June 30, 2001, Aspen would have been forced to

51

report a pro forma net loss for the year of $7.8 million, or $0.26 per share.

216. The improperly recorded revenue from the Logica transaction ($1.75 million) and the Yukos transaction ($4.3 million) combined, resulted in a revenue overstatement of more than $6 million for the year ended June 30, 2001. As mentioned previously, Aspen just met the consensus analyst estimate pro forma loss for the year of $3.5 million, or $0.12 per share. Without the Logica and Yukos transactions, for the year ended June 30, 2001 Aspen would have had to report a pro forma net loss of $9.5 million, or $.32 per share.

217. In fiscal years 2003 and 2004 Aspen made entries to provide a revenue reserve, reducing license revenue, for the Yukos amounts unpaid. The entries were made over four quarters as follows: $1.9 million in the quarter ended December 31, 2002, $1.7 million in the quarter ended March 31, 2003, $750,000 in the quarter ended June 30, 2003, and $360,000 in the quarter ended September 30, 2003.

218. In or about March 2005, Yukos was one of the transactions restated by Aspen following completion of the internal investigation by its audit committee.

219. The effect of the improper accounting for the Yukos transaction was to overstate net income for the quarter and year ended June 30, 2001 by $4.3 million, or $0.14 per share, and to understate net income for the quarters ended December 31, 2002, March 31, 2003, June 30, 2003, and September 30, 2003 by $1.9 million ($0.05 per share), $1.7 million ($0.04 per share), $750,000 ($0.02 per share), and $360,000 ($0.01 per share) respectively. The effect on the year ended June 30, 2003 was to understate net income by $4.5 million, or $0.12 per share.

## Petroleum Services Company

220.    Aspen, acting through the individual defendants, improperly recognized $1.9 million of software license revenue in its fiscal quarter ended June 30, 2002 on a sale to Petroleum Services Company ("PSC"), a Kuwaiti-based re-seller of Aspen software. The revenue should not have been recognized because Aspen entered into contemporaneous side agreements (i) promising additional future products and (ii) agreeing to reimburse PSC for certain agent fees.

221.    On or about June 30, 2002, Aspen entered into a Software License and Service Agreement ("SLA") with PSC. McQuillin and Zappala signed the SLA on Aspen's behalf.

222.    Pursuant to the SLA, PSC was required to make two equal payments of $975,000 to Aspen (for a total payment of approximately $1.9 million). One of the payments was due on September 30, 2002 and the other payment was due on December 31, 2002. PSC made the two required payments on or about October 2, 2002 and on or about January 9, 2003.

223.    At or about the time that the SLA was signed, McQuillin orally agreed, on Aspen's behalf, to provide additional software in the future, at no additional cost, to PSC. The additional software was software which Aspen had recently acquired through an acquisition of Hyprotech, Ltd.

224.    On or about June 30, 2002, E.C., a PSC official, sent an e-mail, which was marked as being of "High" importance and whose subject line was "License Agreement," to McQuillin. In the June 30, 2002 e-mail, E.C. stated, in part: "I have attached the signed license agreement. Please note that ... [the] product list does not include the Hyprotech [software] as per our agreement. I assume that this can be updated later."

225.    On or about June 30, 2002, E.C., a PSC official, sent an e-mail to an Aspen

53

official, on which he copied McQuillin. In the June 30, 2002 e-mail, E.C. stated, in part: "My agreement with David [McQuillin] is that PSC will pay agent fees up to 5%. Aspen will handle anything above this number under the existing agent's agreements. Furthermore, the pre-purchase will be covering all products of Aspen Tech including ... Hyprotech ... ."

226.    On or about June 30, 2002, McQuillin sent an e-mail to E.C., a PSC official. In the June 30, 2002 e-mail, whose subject line was "Business Understanding," McQuillin stated, in part: "PSC will pay agent fees associated with the sell through of the pre-pruchased [sic] license up to 5%. Aspen will handle anything above this number under the existing agent's agreements."

227.    PSC's "agent fees" varied from country-to-country. As a result, at the time that McQuillin sent the June 30, 2002 e-mail to E.C., the PSC official, there was no way for Aspen to determine the costs it would have to prospectively incur in order to reimburse PSC for its "agent fees." As such, McQuillin's June 30, 2002 e-mail resulted in Aspen's prospective costs or fees (related to the $1.9 million June 30, 2002 SLA) as not being "fixed or determinable," in violation of SOP 97-2.

228.    On or about July 4, 2002, McQuillin sent an e-mail to several Aspen employees, on which he copied, among others, Zappala. In the July 4, 2002 e-mail, McQuillin stated, in part: "As you know, PSC did a $2m net license pre-purchase on short notice ... which helped [Aspen] to partially offset the large performance shortfall in license revenue. ... While I am well aware that the terms and timing of this agreement with PSC may not be to the liking of all on this distribution list, I think it should be perfectly clear to you that the company had no choice given the sudden and unexpected performance shortfall we were faced with in the final days of the quarter."

54

229. On or about October 11, 2002, Aspen and PSC entered into an amendment to the SLA. Pursuant to the amendment, Aspen agreed to provide the additional Hyprotech software, for no additional consideration, to PSC. The additional Hyprotech software was delivered by Aspen to PSC in or about November 2002. Zappala signed the October 11, 2002 amendment on Aspen's behalf.

230. Because Aspen's costs or fees related thereto were not "fixed or determinable" at the time that it entered into the June 30, 2002 SLA with PSC, Aspen should not have recognized any revenue from the PSC transaction until PSC had re-sold the Aspen software to its end-users.

231. The $1.9 million revenue from the PSC transaction was improperly recorded on Aspen's books and records and reported on a Form 10-K for the quarter and year ended June 30, 2002. The Form 10-K was signed by Zappala and Evans and was filed with the Commission on or about September 30, 2002. The Form 10-K also included certifications, signed by Evans and Zappala, stating that, based on their knowledge, the financial statements were presented fairly and that the annual report did not contain any untrue statement of a material fact.

232. The revenue from this PSC transaction should not have been recognized in the quarter and year ended June 30, 2002, because the license fee was not fixed or determinable and because delivery was not complete.

233. On or about August 15, 2002, Aspen issued a press release that falsely and inaccurately summarized its financial results for the fiscal fourth quarter and year ended June 30, 2002. The press release also quoted Evans as stating that: "We have taken aggressive actions intended to return us to operating profitability and positive cash flow by the end of this calendar year [.]" The press release also noted that "[d]uring the fourth quarter of fiscal 2002, AspenTech

55

signed 11 license transactions of approximately $1 million or greater."

234.    Evans, McQuillin and Zappala knew, or were reckless in not knowing, that the recognition of license revenue from the PSC transaction in the quarter in which it was recognized was improper.

235.    The misstatements caused by the improper revenue recognition were material. The revenue from the PSC transaction totaled approximately 5.2% of Aspen's license revenue for the quarter ended June 30, 2002.

236.    Aspen's earnings release on August 15, 2002 for the quarter and year ended June 30, 2002 indicated that its fourth quarter net loss, excluding restructuring charges, charges for in-process R&D, write-downs of investments, and accretion of preferred stock discount and dividend was $11.7 million, or $0.34 per share, which failed to meet the consensus analyst estimate of $0.11 loss per share. Had the revenue from the PSC transaction not been recorded in the quarter ended June 30, 2002, Aspen would have been forced to report a net loss of approximately $13.7 million, or $0.39 per share.

237.    Aspen's earnings release also indicated that Aspen's pro forma net loss for the year ended June 30, 2002, excluding restructuring charges, charges for in-process R&D, write-downs of investments, and accretion of preferred stock discount and dividend was $37.3 million, or $1.14 per share, which failed to meet the consensus analyst estimated loss of $0.67 per share. Had the revenue from the PSC transaction not been recorded in the year ended June 30, 2002, Aspen would have been forced to report a pro forma net loss of approximately $39.2 million, or $1.20 per share.

238. The improperly recorded revenue from the March 2002 IBM transaction ($1.7 million) and the PSC transaction ($1.9 million) resulted in a revenue overstatement of more than $3.6 million for the year ended June 30, 2002. Had the revenue from both transactions not been recorded in the quarter ended June 30, 2002, Aspen would have been forced to report a pro forma net loss of approximately $41 million, or $1.27 per share.

239. The revenue from the PSC transaction should have been recorded as the product sold through to end users such that the amount of the agent fees payable by Aspen was determinable. The product sold through over the eight quarters following the year ended June 30, 2002.

240. In or about March 2005, PSC was one of the transactions restated by Aspen following completion of the internal investigation by its audit committee.

241. The effect of the improper accounting for the PSC transaction was to overstate net income for the quarter and year ended June 30, 2002 by $1.9 million, or $0.05 per share, and to understate the next eight quarters by between $57,000 and $687,000 (up to $0.02 per share) per quarter.

## Revenue and Net Income Understated

242. The same improperly recorded transactions which caused overstatements in Aspen's fiscal years 1999 through 2002, resulted in understatements in fiscal years 2003 and 2004. This is because either the revenue was reversed in a later period or would have been properly recorded ratably in that later period or as product was sold through. By at least the time of the revenue reversals the defendants knew or were reckless in not knowing that the

57

transactions were improper. Thus, the defendants should have caused the restatement of the periods when those transactions were originally recorded, rather than reversing them in a current period. As a result, the reversals were also improper. The combined effect of the improper revenue for the transactions discussed herein when reversed and/or recast into the proper period is an understatement of revenue and net income for the years ended June 30, 2003 and 2004 of $11.5 million ($0.30 per share) and $3.4 million ($0.09 per share) respectively.

243. Defendants Zappala and McQuillin signed and falsely certified (i) Aspen's Form 10-Q for fiscal second quarter 2003, filed on or about February 14, 2003, and (ii) Aspen's Form 10-Q for fiscal third quarter 2003, filed on or about May 15, 2003.

244. Defendant McQuillin signed and falsely certified (i) Aspen's Form 10-K for fiscal year 2003, filed on or about September 29, 2003, and (ii) Aspen's Form 10-K for fiscal year 2004, filed on or about September 13, 2004.

## False Management Representation Letters

245. Throughout the period of the fraud described herein, Evans and Zappala, as Aspen's CEO and CFO, respectively, provided numerous false management representation letters to AA, Aspen's outside auditors.

246. On or about August 4, 1999, September 28, 1999, August 7, 2000, September 27, 2000, October 23, 2000, January 22, 2001, April 23, 2001, June 14, 2001, August 3, 2001, October 22, 2001, January 21, 2002 and April 22, 2002, Evans and Zappala signed and provided management representation letters to AA related either to an AA audit or review of Aspen's financial statements. Among other things, all of the aforementioned management representation

letters falsely stated that the relevant financial statements had been prepared in conformity with Generally Accepted Accounting Principles ("GAAP") and that there had been no fraud "involving management or employees who have significant roles in internal control."

## Defendants' Compensation During Relevant Period

247.    Throughout the period of the fraud described herein and continuing until the fraud was discovered, defendants received compensation in the form of salaries, bonuses and/or stock option grants.

248.    Throughout the period of the fraud described herein and continuing until the fraud was discovered, Evans received at least $2 million in salary and bonuses.

249.    Throughout the period of the fraud described herein and continuing until the fraud was discovered, Evans obtained gross proceeds of at least $81,000 from exercising stock options and selling artificially inflated Aspen stock into the marketplace.

250.    Throughout the period of the fraud described herein and continuing until the fraud was discovered, McQuillin received at least $2,446,000 in salary and bonuses.

251.    Throughout the period of the fraud described herein and continuing until the fraud was discovered, McQuillin obtained gross proceeds of at least $1.5 million from exercising stock options and selling artificially inflated Aspen stock into the marketplace.

252.    Throughout the period of the fraud described herein and continuing until the fraud was discovered, Zappala received at least $1,245,000 in salary and bonuses.

253.    Throughout the period of the fraud described herein and continuing until the fraud was discovered, Zappala obtained gross proceeds of at least $622,000 from exercising stock options and selling artificially inflated Aspen stock into the marketplace.

## Aspen's Use of Artificially Inflated Stock for Acquisition Purposes

254.    Between at least June 2000 and May 2002, Aspen, acting through, among others, Evans, McQuillin and Zappala, used its common stock, which was artificially inflated as a result of the fraud described herein, to either acquire, gain control or obtain significant equity interests in at least six corporate entities.

255.    In or about June 2000, Aspen issued and used approximately 2.6 million common stock shares via a private placement to help acquire and/or gain control of Petrolsoft Corporation, a San Diego, California-based company.

256.    In or about August 2000, Aspen issued and used approximately 248,000 common stock shares via a private placement to help acquire and/or gain control of ICARUS Corporation, a Rockville, Maryland-based company.

257.    In or about February 2001, Aspen issued and used approximately 219,000 common stock shares via a private placement to help acquire approximately 3.4 million convertible preferred shares in Optimum Logistics Ltd.

258.    In or about June 2001, Aspen issued and used approximately 323,000 common stock shares via a private placement to help acquire and/or gain control of Houston Consulting Group, L.P.

259.    In or about June 2001, Aspen issued and used approximately 441,000 common stock shares via a private placement to help acquire and/or gain control of Coppermine LLC.

260.    In or about May 2002, Aspen issued and used approximately 4.1 million common stock shares (along with various warrants) via a private placement to help acquire and/or gain control of Hyprotech, Ltd., a Calgary, Alberta-based company.

60

## Aspen's Registration Statements Filed During the Relevant Period

261.    Between at least June 1999 and October 2003, Evans, McQuillin and Zappala, among others, signed registration statements on behalf of Aspen and filed with the Commission for the purpose of offering to sell, and seeking offers to buy, shares of Aspen common stock through secondary offerings.

262.    For example, on or about June 14, 2001, Evans signed a Commission Form S-3 registration statement relating to 562,455 shares of Aspen common stock to be resold by certain holders of the stock through public or private transactions.

263.    For example, on or about July 3, 2002, Zappala signed a Commission Form S-3 registration statement relating to 13,776,392 shares of Aspen common stock to be resold by certain holders of the stock through public or private transactions.

264.    For example, on or about October 17, 2003, McQuillin signed a Commission Form S-3 registration statement relating to 8,358,724 shares of Aspen common stock to be resold by certain holders of the stock through public or private transactions.

## Market Reaction to Defendants' Fraud

265.    Following Aspen's public announcement on October 27, 2004 that its audit committee had commenced a review of certain software license and service agreements, Aspen's stock price dropped from $6.88 per share at closing on October 27, 2004 to $6.68 per share at closing on October 28, 2004, a decline of approximately 3%.

266.    The trading volume on Aspen's common stock also increased by over 400% on October 28, 2004 from the previous day's trading volume (from 368,500 shares traded on October 27 to 1,556,000 shares traded on October 28).

61

267.    Aspen's stock price continued falling in the days following the public announcement that its audit committee had commenced a review of certain software license and service agreements.

268.    Aspen's stock price declined by $1.19, or approximately 17%, per share between the close of the market on October 27, 2004 (when Aspen announced its audit committee's review of certain software license and service agreements) and the close of the market on November 2, 2004.

269.    After Aspen filed its restated financials on March 15, 2005, Aspen's stock price dropped from $6.29 per share at closing on March 15, 2005 to $5.88 at closing on March 16, 2005, a decline of $.41 per share, or approximately 6.5%.

270.    The trading volume of Aspen's common stock also increased by over 100% on March 16, 2005 from the previous day's trading volume (from 1,211,600 shares traded on March 15 to 2,410,500 shares traded on March 16).

271.    Aspen's stock price continued falling in the days following the filing of its restated financials.

272.    Aspen's stock price declined by $.64, or approximately 10%, per share between the close of the market on March 15, 2005 (when Aspen filed its restated financials) and the close of the market on March 21, 2005.

## CLAIMS

### FIRST CLAIM AGAINST ALL DEFENDANTS
### (Violations of Section 17(a) of the Securities Act)

273.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1- 272 of the Complaint as if set forth fully herein.

274.    As set forth above, throughout the period of the fraud described herein and continuing until the fraud was discovered, each of the defendants obtained proceeds from exercising stock options and selling artificially inflated Aspen stock into the marketplace. In addition, between at least June 2000 and May 2002, Aspen, acting through Evans, McQuillin and Zappala, used its common stock, which was artificially inflated as a result of the fraud described herein, to either acquire, gain control or obtain significant equity interests in at least six corporate entities.

275.    By reason of the foregoing, defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or of the mails, in the offer or sale of securities: (a) employed a device, scheme or artifice to defraud; (b) obtained money or property by means of an untrue statement of material fact or omitting to state a material fact necessary to make the statement made, in light of the circumstances under which it was made, not misleading; or (c) engaged in a transaction, practice or course of business which operated as a fraud or deceit upon purchasers of Aspen stock.

276.    As a result, each of the defendants violated Section 17(a) of the Securities Act.


## SECOND CLAIM AGAINST ALL DEFENDANTS
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)

277.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1- 272

63

of the Complaint as if set forth fully herein.

278.    As set forth above, throughout the period of the fraud described herein and continuing until the fraud was discovered, each of the defendants obtained proceeds from exercising stock options and selling artificially inflated Aspen stock into the marketplace. In addition, between at least June 2000 and May 2002, Aspen, acting through, among others, Evans, McQuillin and Zappala, used its common stock, which was artificially inflated as a result of the fraud described herein, to either acquire, gain control or obtain significant equity interests in at least six corporate entities.

279.    As set forth above, each of the defendants knew, or was reckless in not knowing, with respect to the transactions they participated in negotiating and/or with respect to the transactions in which they participated in making revenue recognition decisions, that the recognition of license revenue with respect to said transactions was improper.

280.    As set forth above and as a result of defendants' conduct, all of Aspen's Commission filings throughout the period of the fraud discussed herein were materially false, including, but not limited to, the following filings: (a) Form 10-K for the fiscal year ended June 30, 1999, filed with the Commission on or about September 28, 1999; (b) Form 10-Q for the quarter ended September 30, 1999, filed with the Commission on or about November 15, 1999; (c) Form 10-K for the fiscal year ended June 30, 2000, filed with the Commission on or about September 28, 2000; (d) Form 10-Q for the quarter ended December 31, 2000, filed with the Commission on or about February 14, 2001; (e) Form 10-K for the fiscal year ended June 30, 2001, filed with the Commission on or about September 26, 2001; (f) Form 10-Q for the quarter ended March 31, 2002, filed with the Commission on or about May 15, 2002; (g) Form 10-K for

the fiscal year ended June 30, 2002, filed with the Commission on or about September 30, 2002; (h) Form 10-K for the fiscal year ended June 30, 2003, filed with the Commission on or about September 29, 2003; (i) Form 10-K for the fiscal year ended June 30, 2004, filed with the Commission on or about September 13, 2004.

281.    As set forth above and as a result of defendants' conduct, the Aspen press releases discussed above (which announced Aspen's fiscal quarterly and/or year-end results) were materially false.

282.    As set forth above, each of the defendants made materially false statements by signing the Forms 10-K and 10-Q and by preparing, authorizing, and/or being quoted in the press releases discussed above.

283.    As a result, each of the defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## THIRD CLAIM AGAINST ALL DEFENDANTS
## (Aiding and Abetting Aspen's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)

284.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1- 272 of the Complaint as if set forth fully herein.

285.    As set forth above, Aspen committed numerous violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, including by using its common stock to either acquire, gain control or obtain significant equity interests in at least six corporate entities; issuing false press releases; and making false filings with the Commission.

286.    As set forth above, each of the defendants knew, or was reckless in not knowing, that Aspen's conduct was improper, and each defendant knowingly and substantially assisted

Aspen's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

287.    By reason of the foregoing, each of the defendants aided and abetted Aspen's

violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and, therefore, are

liable for such violations pursuant to Section 20(e) of the Exchange Act.

## FOURTH CLAIM AGAINST ALL DEFENDANTS
## (Violations of Section 13(b)(5) of the Exchange Act and Exchange Act Rules 13b2-1 and 13b2-2)

288.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1- 272

of the Complaint as if set forth fully herein.

289.    As set forth above, defendants, as officers of Aspen, violated Exchange Act

Section 13(b)(5) by knowingly circumventing or knowingly failing to implement a system of

internal accounting controls or knowingly falsifying any book, record, or account described in

Exchange Act Section 13(b)(2).

290.    As set forth above, each of the defendants violated Exchange Act Rule 13b2-1 by,

directly or indirectly, falsifying or causing to be falsified, any book, record or account subject to

Section 13(b)(2)(A) of the Exchange Act.

291.    As set forth above, each of the defendants violated Exchange Act Rule 13b2-2 by,

among other things, either directly or indirectly making or causing a materially false or

misleading statement to be made to an accountant in connection with an audit, review or

examination of Aspen's financial statements. Among other things, the defendants, either directly

or indirectly, provided false financial information and/or management representation letters to

Aspen's outside auditors and failed to provide relevant responsive information.

## FIFTH CLAIM AGAINST ALL DEFENDANTS
## (Aiding and Abetting Aspen's Violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of

66

## the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 Thereunder)

292.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-272 of the Complaint as if set forth fully herein.

293.    As set forth above, Aspen made materially false and misleading Commission filings throughout the period of the fraud described herein, including, but not limited to, the following filings: (a) Form 10-K for the fiscal year ended June 30, 1999, filed with the Commission on or about September 28, 1999; (b) Form 10-Q for the quarter ended September 30, 1999, filed with the Commission on or about November 15, 1999; (c) Form 10-K for the fiscal year ended June 30, 2000, filed with the Commission on or about September 28, 2000; (d) Form 10-Q for the quarter ended December 31, 2000, filed with the Commission on or about February 14, 2001; (e) Form 10-K for the fiscal year ended June 30, 2001, filed with the Commission on or about September 26, 2001; (f) Form 10-Q for the quarter ended March 31, 2002, filed with the Commission on or about May 15, 2002;  (g) Form 10-K for the fiscal year ended June 30, 2002, filed with the Commission on or about September 30, 2002; (h) Form 10-K for the fiscal year ended June 30, 2003, filed with the Commission on or about September 29, 2003; (i) Form 10-K for the fiscal year ended June 30, 2004, filed with the Commission on or about September 13, 2004.  As a result, Aspen violated Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 throughout the period of the fraud described herein.

294.    As set forth above, Aspen failed to maintain accurate books and records and failed to implement adequate internal controls.  As a result, Aspen violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

67

295.    As set forth above, each of the defendants knew, or was reckless in not knowing, that Aspen's conduct was improper, and each defendant knowingly and substantially assisted Aspen's violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13.

296.    By reason of the foregoing, each of the defendants aided and abetted Aspen's violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 and, therefore, are liable for such violations pursuant to Section 20(e) of the Exchange Act.

297.    As set forth above, each of the defendants knew, or was reckless in not knowing, that Aspen's conduct was improper, and each defendant knowingly and substantially assisted Aspen's violations of Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

298.    By reason of the foregoing, each of the defendants aided and abetted Aspen's violations of Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and, therefore, are liable for such violations pursuant to Section 20(e) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court issue a final judgment:

### I.

Permanently enjoining all Defendants from violating, directly or indirectly, Section 17(a) of the Securities Act.

### II.

Permanently enjoining all Defendants from violating, directly or indirectly, Section 10(b)

68

of the Exchange Act and Rule 10b-5 thereunder.

## III.

Permanently enjoining all Defendants from violating, directly or indirectly, Section

13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2 thereunder.

## IV.

Permanently enjoining all Defendants from violating, directly or indirectly, Sections

13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and

13a-13 thereunder.

## V.

Ordering all defendants to pay civil money penalties pursuant to Section 20(d) of

the Securities Act and Section 21(d)(3) of the Exchange Act in amounts to be determined by the

Court.

## VI.

Ordering all defendants to disgorge all of the ill-gotten gains (including

prejudgment interest thereon), including the proceeds of stock sales, salaries and bonuses they

obtained during the period of their misconduct, as described above.

## VII.

Barring, pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of

the Exchange Act, each of the defendants from serving as an officer or director of any issuer that

has a class of securities registered pursuant to Section 12 of the Exchange Act.

## VIII.

Order such other relief as the Court deems just and proper.

69

Respectfully submitted,

Silvestre A. Fontes
    Senior Trial Counsel
LeeAnn G. Gaunt
    Branch Chief
David H. London
    Senior Enforcement Counsel

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, Massachusetts 02110
(617) 573-8991 (Fontes)
(617) 573-4590 (facsimile)

January 8, 2006